340 S.W.3d 607 (2011)
In The Interest of: X.D.G., Minor
Greene County Juvenile Office, Petitioner-Respondent,
v.
M.E.G., Natural Mother, Respondent-Appellant.
No. SD 30866.
Missouri Court of Appeals, Southern District, Division One.
April 26, 2011.
Rehearing Denied May 12, 2011.
Application for Transfer Denied June 28, 2011.
*609 James R. Sharp, Springfield, MO, for Appellant.
William C. Prince, Springfield, MO, for Respondent.
BARNEY, P.J., LYNCH, J., and BURRELL, J.
PER CURIAM.
M.E.G. ("Mother") appeals the termination of her parental rights to and over her young child, X.D.G. ("Child"). The judgment entered by the Juvenile Division of the Circuit Court ("the trial court") terminated Mother's parental rights on the grounds of abuse and/or neglect and a failure to rectify the conditions that caused Child to come into alternative care ("failure to rectify").
Because the trial court's abuse/neglect and failure to rectify findings were not supported by substantial evidence of a convincing link between Mother's past behavior, her conduct at the time of the termination trial, and the trial court's prediction of the likelihood of future harm to Child, as mandated by our high court in In re K.A.W., 133 S.W.3d 1, 11 (Mo. banc 2004), we must reverse the trial court's judgment in regard to its termination of Mother's parental rights.[1]

*610 Facts
While our recitation of the relevant facts is generally in accordance with the principle that trial evidence is viewed in the light most favorable to the decision, see In re C.A.M., 282 S.W.3d 398, 405 (Mo. App. S.D.2009); In re M.R.F., 907 S.W.2d 787, 789 (Mo.App. S.D. 1995), we also cite opposing evidence because grounds for termination must be supported by evidence that "instantly tilts the scales in favor of termination when weighed against the evidence in opposition and the finder of fact is left with the abiding conviction that the evidence is true." K.A.W., 133 S.W.3d at 12 (emphasis added).
On April 22, 2008, Greene County Children's Division employee Pamela Drake investigated a hotline call that alleged Child, approximately seven weeks old at the time, had a fracture of the tibia bone of his left leg. Medical records indicated that Child was examined in the emergency room on the evening of April 21, 2008. Drake contacted Mother at the hospital emergency room where Mother and Child's paternal great-aunt had taken Child for examination and treatment. Mother told Drake that she brought Child to the emergency room when Father noticed Child's leg was swollen. Mother "had no explanation[]" for the injury other than stating that both parents had been pushing or pumping Child's legs to relieve gas. Mother "said that for the past two, two-and-a-half weeks, [Child] had been extremely fussy[]" and "cried all the time." Mother told Drake that Child "cried the most when he was having his diaper changed." Mother told Drake that Child had been in the care of Father and herself ("the parents") during the previous two weeks. Mother also explained to Drake that immediately after Child's birth, the family lived with Mother's parents before moving to their own home. Child was released from the hospital into Mother's care, and Drake continued her investigation.
Father called Drake on April 23rd and he told her that about a week earlier he noticed that Child's left calf felt harder than the right one, but he did not notice any swelling until the evening Child was taken to the hospital. Drake said Father indicated that he noticed the swelling around 8:00 p.m. Father told Drake that about two weeks before the trip to the emergency room, Child did not want to be held, was "very fussy," and cried constantly. During that time, Father did not think Child had been left with anyone. He said that about three weeks previously Child had stayed with Mother's parents for about three-to-four hours.
Drake then visited the parents' home that same day, and Father told her at that point that other people had been around the infant during "the past few weeks." Both parents told Drake that they had taken Child to the doctor three times in the past week. Drake spoke with one of the doctors, who indicated to her that Child was diagnosed with acid reflux. Drake did not speak with the other doctors the parents had mentioned. It was arranged that Father's mother would stay in the parents' home with Child and act as Child's primary caregiver until a conference with a juvenile officer could be held the following day.
At the conference with the juvenile officer, the parents could provide no satisfactory explanation for how Child had been injured. Because the weekend was coming up, the parents agreed to allow Child to stay with relatives and that they (the parents) would not have any unsupervised visitation with Child. A day or two later, Mother gave Drake a list of seven people she said had been in the parents' home during the two week period before they *611 had taken Child to the emergency room. Drake spoke with several people, but she did not know if any of them were on the list Mother had given her.
Dr. Rogers saw Child on April 23rd. He testified that the parents' only explanation for the break (which the doctor described as being at "the mid-shaft of [Child]'s left tibia)," was that Child "had a lot of gas pain and that they had been performing some sort of a maneuver to pump his legs back and forth to try and assist with expulsion of the gas." Dr. Rogers did not believe that such activity was consistent with the type of injury he had observed and stated, "The amount of force that would be required to break the tibia, you know, in an infant, would be considerable, and I did not think that simply holding the legs and pumping them back and forth would administer sufficient force to the leg toto produce such a fracture." Dr. Rogers said that because a young child's bone is not brittle, it generally tends to bend before it breaks  like "a green stick off of a tree"  and is therefore difficult to break.
Dr. Rogers further explained that because Child was too young to walk, or even to roll over, some potential causes of injury  such as rolling off a bed or falling down while playing  could be eliminated. When asked whether he could say when the fracture had occurred, Dr. Rogers stated:
It's difficult to say exactly. However, in a young patient, they tend to produce callus or healing bone quickly, and sort of the younger thethe patient is, the faster the callus will begin to show up on x-ray. And I noted that there was no callus that was visible on the x-rays that had been taken on April 21st or April 22nd, so I assumed that it was aan acute fracture probably within a week, but it's hard to say exactly.
Dr. Rogers also testified that there was no visible bruising on Child's leg, but the injury showed swelling and Child indicated pain when the leg was moved. He explained that swelling is the most common visible sign of injury; bruising can vary from child to child. Dr. Rogers testified that the swelling, caused by injury to the soft tissue around the bone and/or bleeding from the broken bone itself, commences "[w]ithin hours, for sure." Thereafter, "you would expect some swelling probably to persist for a couple of weeks anyway." Finally, Dr. Rogers said that it would have been unusual for such a child to be seen in a doctor's office or emergency room without someone noticing the fracture.
By April 30, 2008, an additional medical evaluation had been completed and revealed that Child had also sustained other fractures. Dr. Clyde Parsons, III testified that records from a full-body scan performed on Child on April 24, 2008, not only confirmed the left tibia fracture previously discovered by Dr. Rogers but also revealed fractures of Child's right tibia and the ulna bone in Child's left arm. Dr. Parsons estimated that as of April 29, 2008, when he saw Child, the left tibia fracture "was probably ten days to two weeks old." He said it was more difficult to estimate the occurrence of the other two injuries because "[t]hey didn't involve as much skeletal trauma, so they're not going to show as much new bone when they heal."
Dr. Parsons also said it was possible that the injuries to the right leg and left arm happened at approximately the same time. Dr. Parsons testified that the fracture to the left tibia was from "some sort of combination of twisting and direct force." Dr. Parsons opined that the fractures to the right tibia and left ulna had resulted from a twisting force. Dr. Parsons saw no indication of "inherent bone *612 problems" that would account for these injuries. Drake testified that she was eventually informed by another medical provider that genetic testing had revealed no abnormalities that would help explain Child's injuries. In follow-up medical visits, Child was observed to be healing well and had acquired no new injuries.
Dr. Mark Bradford, a psychologist, performed psychological assessments of the parents in October and November 2009. Dr. Bradford testified that Mother was defensive about the situation and indicated that the cause of Child's injuries was unknown. When questioned by Mother's attorney, Dr. Bradford elaborated as follows:
Q. And did [Mother] agree that [Child] was injured while on her watch or while in her custody?
A. I think one thing that Ithat I tried to make really clear to [the parents] is that they have to take responsibility when a child was injured, quote, on your watch, unquote, and take responsibility andand do what you've got to do to fix that. I think my concern about them was that they were very resistant to doing that.
Q. Okay.
A. But I will say that towards the end, she was increasingly saying, "I know it'sit's our responsibility, and we have toto take responsibility for it."
Q. Okay. So she was taking responsibility for that?
A. When I saw her in October 2009, it seemed like it was quite a long while to get there, but she was beginning to at that point.
Dr. Bradford testified that while Mother "has a personality with a lot of narcissistic and some borderline features[,]" he did not actually diagnose Mother with borderline personality disorder and found that she suffered from no debilitating mental disorders. Dr. Bradford testified that if Mother had actually hurt Child, but would not admit having done so, he would have some "potential fear" or concern that she had repressed rage and had not dealt with it. At the same time, he acknowledged that it was possible to work through an issue in therapy without a confession. In such a case, he would recommend continued therapy and "continued services to make sure that these things [raised in therapy] are working." Dr. Bradford also testified that admitting conduct that did not occur due to pressures of "the system" and a desire to get Child back "might" bring up an entirely different set of problems that "might" be as troublesome as not admitting actual conduct.
The trial court then asked Dr. Bradford the following hypothetical question and received the following response.
Q. If she had injured the childand, again, this is just a hypothetical questionand hadn't admitted it, isdo you believe that there is more or less of a risk of reoffending than if she had injured the child and had admitted it? Doesdoes that make some sort of sense?
A. Yes. I tend to believe that if she had injured the child and has not admitted it, then this creates a little more risk ofof some kind of blow-up or some kind of issue in the future, because ifif you do injure a child, you go through the system andyou know, and you get out, it means you really haven't dealt with the issue, and it's a possibility of some repressed rage or some secret anger or something incongruous within you that's just not quite resolved. So it's going to contribute to anger or depression or anxiety, you know, at a deep unconscious level. It may come out in some unfortunate way in the future. That'sthat's a hypothetical possibility.
*613 Dr. Bradford confirmed at trial the statement in his written report that "if the therapists think [Mother] has made enough progress, we are cautiously optimistic that she may have gained enough in therapy and treatment that an attempt might be made to return the child." That report, which was admitted as evidence, went on to provide: "That is, after a period of monitoring with unsupervised visits, and [sic] gradual reunification plan might be attempted with ongoing monitoring for a period of time."
Joan Wells provided Mother with individual counseling services from November 2008 through October 2009. Wells testified that her therapy ended when both she and Mother concluded that they "had addressed all the stated goals[]" of counseling. According to Wells, Mother "did not take responsibility for inflicting [the injuries]. She took responsibility for being the parent that should have prevented the injuries, but she didn't take responsibility for the injuries." Wells testified that if Mother had accidentally or intentionally injured Child and then not disclosed that information, Wells would recommend continued counseling for Mother. Under this same scenario, she would recommend increasing supervised visits over time followed by a determination of whether unsupervised visits were then warranted.
Stephen Reiutz began providing couples' counseling to Mother and Father in December 2008 and was still counseling them approximately once-a-month at the time of trial in January 2010. Reiutz testified that neither parent took responsibility for causing Child's injuries. Both parents told him that they did not understand how the injuries had occurred. Reiutz testified that if he knew that there was a serious anger issue that caused the injuries, then he might have addressed such an issue differently in counseling, but he had not seen any evidence of an anger issue during his course of counseling with the parents. Reiutz testified that both parents seemed very committed to Child and gave no indications that they resented or would harm Child. Reiutz did not see any problem in permitting the parents to have unsupervised visits with Child. Reiutz did recommend additional counseling to help them adjust in the event Child was returned to their care.
The caseworker responsible for the case from August 2008 until trial, Jeremy Elliott, testified that the parents had suggested several possible explanations for Child's injuries but that he still did not know who had actually caused Child's injuries and did not know whether either parent posed a threat to Child. On the positive side of the ledger, Elliott testified that Mother had successfully completed everything on the treatment plan that had been prepared by the original caseworker. He testified that Mother consistently visited Child and that the visits he had supervised went well. Elliott confirmed that a test of Mother's hair and nails in March 2009 was negative for illicit drug use; that no other assessment for drug abuse was deemed necessary; and that there was no reason to believe that Mother was abusing alcohol or violating any laws. Mother completed both psychological assessments suggested for her and met her individual and couples' therapy requirements. Elliott testified that the parents' residence was satisfactory in terms of its safety, stability and cleanliness and that the parents "move[d] to a bigger house [that was also satisfactory] in anticipation of maybe getting [Child] back."
Elliott testified that Mother kept him informed as to what was generally going on in her life, that she attended meetings regarding Child, and that she provided information on release forms upon request. *614 Elliott said that Mother consistently worked with him while he had the case and that monetary support for Child was being withheld from Mother's wages. Mother also provided in-kind items like diapers and clothing. Elliott testified that Mother did not attend some of Child's minor visits to the doctor but that she did attend significant doctor's appointments. Mother also completed her parenting classes and was not asked to attend any additional classes.
On cross-examination by Mother's attorney, Elliott testified as follows.
Q. I believe you testified that [Mother] had done everything on her treatment plan; is that correct?
A. Correct.
Q. But you're still recommending that parental rights be terminated.
A. Correct.
Q. Is that correct?
A. Yes.
Q. And that's because you're not 100 percent sure of safety if [Child] is returned.
A. Correct.
Q. Can you ever be 100 percent sure of safety when a child is returned?
A. If I knew who the perpetrator was, yes.
Q. Okay. But in otherDo we have other cases where we don't know who the perpetrator is or no one's admitted being a perpetrator and we return the children?
A. Yes.
In response to a cross-examination from Father's counsel, Elliott indicated that he did not feel the parents would hurt Child while in their care, "[b]ut based on not knowing who hurt this child and a child abuse and neglect review that I got back in May 2009, I can't be 100 percent guaranteed that he would be safe in that home." Elliott had prepared a written "TPR summary" that apparently recommended that both parents' parental rights be terminated. That report was received into evidence on the limited question of whether termination was in Child's best interests.
Mother testified at trial. She denied harming Child either deliberately or accidentally. She testified that she understood that Child had suffered three fractures but did not know what had caused them. Mother stated that she took Child to the doctor on March 19th and 26th, and twice in April, on the 14th and 17th. Mother said she also contacted the "nurse-on-call" several times about Child's fussiness.
Mother testified that Child was circumcised on March 19th and had a follow-up visit for that procedure on March 26th. At least one of these visits was considered a "well baby checkup," but Mother also addressed Child's fussiness and a "matted" or infected eye. According to Mother, no one said anything to her on any of those occasions about Child possibly having broken bones. Mother testified that she intended "to do a better job as a mother to protect [Child]." She said she had learned disciplining techniques in her parenting classes; her individual counseling had helped her overcome some personal issues and cope with others; and she was learning skills in couples counseling to help her communicate with Father, relieve stress, and cope with financial difficulties.
Father also testified at trial. He testified that he considered various possibilities for the cause of Child's injuries, including whether he could have hurt Child by pumping his legs to relieve gas, stating, "I mean, I'mI've got big hands, I'm a big guy. I may have accidentally gripped him too tightly or something." However, he *615 aid he did not really know who hurt Child and that he had not witnessed anyone injure Child. Father did not think Mother had hurt Child based on his observations of her with other children and "based on the amount of time that her [sic] and I have been together as a couple. It doesn't fit her character on what I have experienced with her over the years."

The Trial Court's Findings
In its termination judgment, the trial court found both that Child had been abused and/or neglected and that the parents had failed to rectify the conditions that resulted in Child being taken into protective custody.[2] The trial court found that Child had "suffered multiple fractures while in the care of the parents and that these fractures were non-accidental in nature and the result of physical abuse by one or both parents." The trial court found the injuries "were not treated immediately as needed" and "that both of the parents knew or should have known of the injuries and the need for medical treatment." As a result, "the parents failed to provide [Child] with a safe home environment[.]" In assessing whether termination was warranted, the trial court found that
[t]here is significant likelihood of future harm to [Child] if parental rights are not terminated due to the significant injuries intentionally inflicted upon [Child] while in the parents [sic] care, the failure of the parents to seek timely medical attention for at least one of the fractures, the continuing failure of the parents to take responsibility for [Child]'s injuries or provide a reasonable explanation for these injuries, and the recent non-accidental injury to [Child] while in the parents' care during an unsupervised visit.[[3]]

Analysis
"In termination of parental rights cases, appellate courts defer to the *616 trial court's ability to judge the credibility of witnesses and will affirm the judgment unless there is no substantial evidence to support it, it is contrary to the evidence, or it erroneously declares or applies the law." K.A.W., 133 S.W.3d at 11. Under section 211.447.6,[4] parental rights may be terminated "if the court finds that the termination is in the best interest of the child and when it appears by clear, cogent and convincing evidence that grounds exist for termination pursuant to subsection 2, 4 or 5 of this section." "[C]lear, cogent and convincing evidence instantly tilts the scales in favor of termination when weighed against the evidence in opposition and the finder of fact is left with the abiding conviction that the evidence is true." K.A.W., 133 S.W.3d at 12.
Mother is correct that "a parent's right to raise his or her children is a fundamental liberty interest protected by the constitutional guarantee of due process, [and] appellate courts must examine the [trial] court's findings of fact and conclusions of law closely." In re W.C., 288 S.W.3d 787, 794-95 (Mo.App. E.D.2009). In acknowledgement of this fundamental liberty interest, statutes governing the termination of parental rights must be construed in favor of parents. In re S.M.H., 160 S.W.3d 355, 362 (Mo. banc 2005).
As best we discern it, Respondent's petition alleged two grounds for termination as to Mother: abuse and/or neglect and failure to rectify. See section 211.447.5(2) and (3).[5] The trial court found *617 that both grounds had been proven by clear and convincing evidence. "When a trial court finds multiple statutory bases to terminate a parent's rights, we need only determine that one of the statutory grounds was proven in order to affirm the judgment." In re K.M.C., III, 223 S.W.3d 916, 926 (Mo.App. S.D.2007).

Point I  Abuse and/or Neglect
Mother's first point asserts the trial court's finding that Mother abused and neglected Child was not supported by substantial evidence.[6] In order to successfully assert that a judgment is not supported by substantial evidence, three steps must be completed:
(1) identify a challenged factual proposition, the existence of which is necessary to sustain the judgment;
(2) identify all of the favorable evidence in the record supporting the existence of that proposition; and,
(3) demonstrate why that favorable evidence, when considered along with the reasonable inferences drawn from that evidence, does not have probative force upon the proposition such that the trier of fact could not reasonably decide the existence of the proposition.
Houston v. Crider, 317 S.W.3d 178, 187 (Mo.App. S.D.2010).
Here, Mother challenges the factual proposition found by the trial court that "there is a significant likelihood of future harm to the child if the parental rights are not terminated[]" by contending there was no evidence that she injured Child, that she took Child to the doctor numerous times before the injuries were discovered in the emergency room, that her home was safe for Child, that there was no evidence that she injured Child after he was taken into custody, that she attended therapy and classes as referred, and that her therapists agreed she was not a threat to Child and was ready for unsupervised visits. Mother argues that "[w]hether or not [Child] was injured while in the parents' care is not at issue-whether [Child] is subject to a reasonable risk of future harm if returned to the parent is."
Mother also satisfies the requirement in the first step that the truth of the factual proposition  a likelihood of future harm  is necessary to the judgment. "A judgment terminating parental *618 rights must be based upon more than past conditions." In re C.W., 211 S.W.3d 93, 98 (Mo. banc 2007). The trial court's finding was phrased in terms of a "significant likelihood of future harm[.]" Mother correctly asserts that a likelihood of future harm must be shown by "clear, cogent, and convincing evidence," citing K.A.W., 133 S.W.3d at 9-10, which noted that
[c]ourts have required that abuse or neglect sufficient to support termination under section 211.447.4(2)[[7]] be based on conduct at the time of termination, not just at the time jurisdiction was initially taken. In the Interest of B.C.K. and K.S.P., 103 S.W.3d [319,] [] 328 [(Mo.App.2003)]; In the Interest of T.A.S., 32 S.W.3d 804, 812 (Mo.App. 2000) (T.A.S. I). Similarly, courts have required that a failure to rectify sufficient to support termination under section 211.447.4(3) be based on a determination that conditions of a potentially harmful nature continued to exist as of the termination, rather than a mere finding that conditions that led to the assumption of jurisdiction still persisted. In the Interest of T.A.S., 62 S.W.3d 650, 656-7 (Mo.App.2001) (T.A.S. II).
Id. at 10. As a result, our high court cautioned trial courts against relying on previous findings of neglect made either at the time it found the allegations of the underlying abuse/neglect petition to be true or at some other point prior to the trial of the termination action. Id. Instead, "[t]he circuit court's findings and conclusion must be based not only on the parent's past conduct but also on the parent's conduct at the time of termination." In re J.M.N., 134 S.W.3d 58, 69 (Mo.App. W.D.2004) (citing K.A.W., 133 S.W.3d at 10) (emphasis added).
K.A.W. made clear that
[a]n essential part of any determination whether to terminate parental rights is whether, considered at the time of the termination and looking to the future, the child would be harmed by a continued relationship with the parent. A prospective analysis is required to determine whether grounds exist and what is in the best interests of the child for the reasonably foreseeable future.
133 S.W.3d at 9. And while K.A.W. acknowledged that "it is difficult to predict the future," id., and did not completely discount the precept that "a parent's past patterns provide vital clues about present and future conduct," In re E.F.B.D., 245 S.W.3d 316, 327 (Mo.App. S.D.2008), it nonetheless held that
it is insufficient merely to point to past acts, note that they resulted in abuse or neglect and then terminate parental rights. Past behavior can support grounds for termination, but only if it is convincingly linked to predicted future behavior. There must be some explicit consideration of whether the past acts provide an indication of the likelihood of future harm.
K.A.W., 133 S.W.3d at 9-10 (citation and footnote omitted).
The termination of a fundamental right must be based on verifiable facts; it cannot be based on speculation. C.W., 211 S.W.3d at 100. In K.A.W., the Court stated, among other things, that it would analyze each of the trial court's findings to see if the trial court "provide[d] an indication of the likelihood of future harm to the [children]." 133 S.W.3d at 12. We are *619 constitutionally bound to follow the most recent controlling decision of our supreme court. Stephens v. Brenton, 920 S.W.2d 109, 111 (Mo.App. S.D.1996). We must therefore determine whether a clear, cogent, and "convincing link" was established between Mother's past abuse of Child and the trial court's prediction of the likelihood of future abuse. See In re K.W., 167 S.W.3d 206, 210-11 (Mo.App. E.D.2005) (holding that the analysis required by K.A.W. involves a determination of a "convincing link" between past behavior and predicted future behavior, and "explicit consideration" of an indication of the likelihood of future harm).
Concerning the second step of our substantial evidence analysis, Mother acknowledges the evidence favorable to the trial court's termination judgment and states in her brief that "[t]here is no question that the injuries to [Child] occurred while [Child] was in [the] parents' care and Mother and Father have admitted as much."[8] Mother identified Elliott's testimony that he could not be "one hundred percent" sure that Mother would not hurt Child in the future as evidence supporting a potential future threat. Mother also acknowledged Dr. Bradford's testimony that "if Mother actually did injure [Child] it might be helpful if she admitted it[.]" Without so finding, we will  solely for purposes of our analysis of the sufficiency of the evidence of a convincing link between past behavior the likelihood of future harm  also presume that Mother intentionally inflicted the bone fractures suffered by Child.
As for the third step  demonstrating that the favorable evidence does not have probative force upon the proposition-Mother asserts that the standard is a "`reasonable likelihood' that [Child] will be harmed if returned to the parents" and that Elliott's testimony cannot meet this standard. (Emphasis retained from original). We do not read K.A.W. as mandating proof of a reasonable likelihood that a child will be harmed if returned, rather we look to the statement in K.A.W. that there must be "an indication of the likelihood of future harm[]" and assess, as directed by K.A.W. and other cases, whether there was "clear, cogent and convincing evidence [that] instantly tilt[ed] the scales in favor of termination[.]" 133 S.W.3d at 10, 12.
Assuming the trial court found Elliott's testimony credible, this evidence could do nothing more than establish that Elliott was not absolutely certain that Child would be safe if returned to the parents and that he could only be "one hundred percent sure" if he knew which parent had caused the fractures and/or one or both parent(s) admitted to having done so. Elliott testified that "[t]he Children's Foundation recommendation is to grant termination of parental rights based on we're [sic] not 100 percent sure that [Child] will *620 be safe if [Child] is returned." The nature of the Children's Foundation and the authoritativeness of its recommendations were not developed at trial. And while a high concern for children's safety is to be encouraged, it does not (and cannot) act as a substitute for the statutory requirements governing the termination of parental rights as set forth in section 211.447.
While acknowledging Dr. Bradford's testimony that he would have some concern that Mother had repressed rage if she had actually hurt Child and had not confessed to it, Mother argues that this testimony fails as clear, cogent and convincing proof of the likelihood of future harm because Dr. Bradford also indicated that her failure to admit abuse would not prevent treatment from being effective. Viewed in a light most favorable to the judgment, Dr. Bradford's testimony was insufficient to demonstrate a convincing link between Mother's past behavior and the likelihood of future harm so as to warrant termination, but rather, as he recommended, it supported a need for continued therapy and "continued services to make sure that these things are working." Dr. Bradford did not recommend termination of parental rights; instead he was "cautiously optimistic" about a gradual reunification between Mother and Child.
We next consider whether the testimony of Dr. Bradford and Elliott, taken together and with all other evidence favorable to the judgment, was sufficiently probative to indicate a likelihood of future harm. Dr. Bradford's testimony was very restricted concerning any future risk occasioned by a failure to confess and was couched in terms of "potential concerns," "a potential fear" and "a hypothetical possibility." He "tend[ed]" to believe that a refusal to confess if guilty "creates a little more risk ofof some kind of blow-up or some kind of issue in the future." While such testimony may certainly be considered, and in a particular case might combine with other more specific testimony to produce the necessary probative force, we find that his testimony here was so speculative in regard to future risk that it could not combine with Elliott's testimony as previously related (in itself insufficient to provide substantial evidence) so as to satisfy the legal standard of clear, cogent and convincing evidence.

Reliance on "Evidence" of an Additional Injury
In her identification of evidence possibly supporting the judgment, Mother also referred to a finding by the trial court regarding a different, more recent injury to Child. The trial court stated in its judgment that
[s]everal months ago, the visits were modified to include a brief period of unsupervised visitation. However, during one of the first unsupervised visits with the parents, [Child] suffered bruising to [the] arm which was the result of non-accidental trauma. As a result, unsupervised visitation was terminated. However, supervised visitation remained in place. Following a hearing on this matter, all visitation was recently terminated by this Court.
As Mother suggests, there is no reference to any "non-accidental bruising" to Child's arm in the trial transcript. Mother asserts that this finding must be disregarded because there is no evidence concerning the bruising, how it affected Child, or whether it resulted from an act by one or both parents. We also note that Respondent's brief makes no reference to this finding regarding post-trial bruising and makes no argument that it qualifies as evidence supporting the judgment.
Mother refers us to a docket entry dated August 9, 2010, that indicates evidence was *621 heard and a docket entry the following day that suspended all visitation between the parents and Child. The referenced docket entries are included in the Legal File, but they were made in the underlying abuse/neglect case and stated:
09-Aug-2010 Hearing Held
[Appearances stated for the parties, including Mother with her attorney] Hearing HeldEvidence Heard. Court takes Hearing regarding visitation under advisement. JUDGE JONES/krp. [Schedule and Setting shown].
10-Aug-2010 Order
Effective immediately, all visitation between [Child] and [the] biological parents is hereby suspended. Judge Jones/jer
A signed order was also issued, but it simply provided, "Effective immediately, all visitation between [Child] and [the parents] is hereby suspended." (Emphasis retained from original).
While a trial court generally has discretion to reopen evidence, Riddell v. Bell, 262 S.W.3d 301, 306 (Mo.App. W.D. 2008), and "a court on its own motion, may take judicial notice of its own records in prior proceedings which are between the same parties on the same basic facts involving the same general claims for relief[,]" State v. Dillon, 41 S.W.3d 479, 482 (Mo.App. E.D.2000), "when the record in another case forms an essential element of a party's claim or defense, the record itself must be introduced in evidence, absent an admission of its contents by the opposing party." Meiners Co. v. Clayton Greens Nursing Ctr., Inc., 645 S.W.2d 722, 724 (Mo.App. E.D.1982).
Mother does not admit the trial court's findings on this issue. And given the heightened scrutiny we apply when reviewing the termination of a fundamental right, we are not prepared, on this record, to consider it as evidence of the likelihood of future harm. Even if it could be considered, the docket entries and the resulting order do not state that the trial court found that Child was non-accidentally bruised by one or both parents. This, of course, does not mean that Respondent is barred from further addressing the matter in any future judicial proceedings relating to the parents and Child.
Because the trial court's termination judgment as to Mother based on abuse/neglect is not supported by substantial evidence of a convincing link between Mother's previous abuse and the likelihood of her future danger to Child, Mother's first point is granted.

Point IIFailure to Rectify
Mother's second point asserts the trial court's termination of her parental rights on the ground of failure to rectify was not supported by substantial evidence because, among other reasons, the "consensus of Mother's therapists was that she did not pose a threat to [Child] and was ready to resume unsupervised contact with [Child]." Our analysis of this contention will proceed in the same manner used to address point one.
Mother identifies the trial court finding at issue as "conditions of a potentially harmful nature continue to exist and there is little likelihood that those conditions can be remedied at an early date so that [Child] could be returned to a parent in the near future[.]" Mother identifies the conditions the trial court found unremedied as:
the nature of [Child]'s injuries, the failure of the parents to seek prompt medical treatment, the parents' unwillingness and failure to take responsibility for the physical injuries inflicted on their infant child, the significant likelihood of future *622 harm to [Child] if the parental rights are not terminated, and the ongoing failure of the parents to demonstrate the ability to provide [Child] with a safe and secure family home within the reasonably foreseeable future.
Mother asserts the evidence was insufficient to support these findings because a termination judgment based on failure to rectify must also include an explicit consideration of whether previous behavior provides an indication of the likelihood of future harm, citing S.M.H., 170 S.W.3d at 533. The S.M.H. court relied on K.A.W. in the context of a failure to rectify claim[9] and found that the record did not demonstrate a "convincing link" between the mother's previous emotional issues and her predicted future behavior. Id. Thus, Mother challenges a factual proposition necessary to support a termination based on failure to rectify.
The trial court made additional findings related to its failure to rectify determination, but none of them constitute evidence of a convincing link between Mother's past behavior and a likelihood of future harm. The trial court found that although the parents participated in a social services contract, they did not take responsibility for or reasonably explain Child's injuries. While this finding is certainly supported by substantial evidence, it does not amount to evidence that either Mother's participation in services or her failure to take responsibility for having abused Child constitutes evidence of the likelihood of future harm. In fact, the trial court found that the parents had not assimilated the services provided to them because they had not admitted or reasonably explained Child's injuries.
It was not demonstrated that the goal of these services was to induce Mother to confess to harming Child; presumably they were designed to help the parents acquire skills that would allow them to provide Child with the proper care and protection so that the goal of reunifying the family could be achieved. No evidence was presented that a failure to explain or admit culpability for Child's injuries was the equivalent of evidence of future dangerousness. There was also a lack of any evidence demonstrating that Mother could not assimilate future services designed to keep Child from being harmed.
The trial court's termination based on failure to rectify was also unsupported by any substantial evidence of a convincing link between the conditions that led to Child's removal and the likelihood that Mother continued to represent a danger to Child. Mother's second point is also granted. Because neither of the trial court's stated grounds for termination was supported by substantial evidence, we do not consider whether termination was in Child's best interests. See In re C.A.L., 228 S.W.3d 77, 85 n. 8 (Mo.App. S.D.2007) ("An appellate court, like the trial court, can reach the issue of best interests of the child only after a determination that one or more of the statutory grounds for termination exist)."
In closing, we stress that this opinion is limited to a finding that the record before us lacks sufficient evidence of the necessary "convincing link" between Mother's past behavior and the likelihood of future harm. It does not mean that Mother's parental rights may not be terminated upon a future showing of such evidence or that Child should be removed from the supervision of the trial court at this time and returned to Mother and/or Father. See K.W., 167 S.W.3d at 216 n. 8 (noting *623 that protective custody is unaffected by the reversal of a termination of parental rights judgment and that the possibility of future termination proceedings is not foreclosed).
That portion of the trial court's judgment terminating Mother's parental rights to and over X.D.G. is reversed.
NOTES
[1] The trial court's judgment also terminated the parental rights of Child's father ("Father"). As Father is not a party to this appeal, we make no decision regarding the propriety of the trial court's termination of his parental rights and refer to evidence about Father only as necessary to address Mother's appeal.
[2] Respondent's "Petition to Terminate Parental Rights" did not indicate what subsection(s) of section 211.447 it alleged authorized the court to terminate Mother's parental rights. It requested termination for the reason that Child "has been abused and/or neglected." It also requested termination because Child "has been subject to the jurisdiction of the court for more than one year and the conditions leading to [Child]'s removal continue to exist or conditions of a potentially harmful nature exist such that [Child] cannot be returned to the parental home in an ascertainable period of time" with the additional allegation that continuing the parental relationship diminishes Child's prospects for a stable home. The petition did not directly accuse either parent of inflicting Child's injuries. Instead, it simply asked the trial court to:

make findings on ... [w]hether the child has been subjected to a severe or recurrent acts of physical ... abuse by the parents... or by another under circumstances that indicate that the parent knew or should have known that the acts were being committed toward the child or any child in the family. While in the care, custody and control of the mother and of the father the minor child suffered a displaced fracture of the left tibia; a non-displaced fracture of the right tibia; and an avulsion fracture of the left ulna. The nature of the injuries was consistent with child abuse and neither the mother nor the father could provide a reasonable explanation for the cause of the child's multiple fractures.
Based on the language of the petition, it is difficult for us to determine whether Respondent was alleging direct abuse of Child by Mother and/or Father or that they should have known such acts were being committed by another. As Mother has not challenged the sufficiency of Respondent's petition in her appeal, we do nothing more than note here that such a practice is not to be encouraged.
[3] The trial transcript is devoid of any reference to a recent non-accidental injury to Child while in the parents' care. Respondent's petition also makes no reference to any such event, and Respondent does not mention it in its brief.
[4] All statutory references are to RSMo Cum. Supp.2009.
[5] As relevant here, the statute states:

5. The juvenile officer or the division may file a petition to terminate the parental rights of the child's parent when it appears that one or more of the following grounds for termination exist:
. . .
(2) The child has been abused or neglected. In determining whether to terminate parental rights pursuant to this subdivision, the court shall consider and make findings on the following conditions or acts of the parent:
. . .
(c) A severe act or recurrent acts of physical, emotional or sexual abuse toward the child or any child in the family by the parent, including an act of incest, or by another under circumstances that indicate that the parent knew or should have known that such acts were being committed toward the child or any child in the family; or
(d) Repeated or continuous failure by the parent, although physically or financially able, to provide the child with adequate food, clothing, shelter, or education as defined by law, or other care and control necessary for the child's physical, mental, or emotional health and development;
(3) The child has been under the jurisdiction of the juvenile court for a period of one year, and the court finds that the conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist, that there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future, or the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home. In determining whether to terminate parental rights under this subdivision, the court shall consider and make findings on the following:
(a) The terms of a social service plan entered into by the parent and the division and the extent to which the parties have made progress in complying with those terms;
(b) The success or failure of the efforts of the juvenile officer, the division or other agency to aid the parent on a continuing basis in adjusting his circumstances or conduct to provide a proper home for the child;
(c) A mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control;
(d) Chemical dependency which prevents the parent from consistently providing the necessary care, custody and control over the child and which cannot be treated so as to enable the parent to consistently provide such care, custody and control[.]
[6] Mother also improperly asserts in the same point that the judgment was not supported by the weight of the evidence, thereby making two distinct legal challenges in a single point relied on. See C.A.M., 282 S.W.3d at 405 n. 5 (Mother makes the same combination of legal challenges  substantial evidence and weight of the evidence  in point two, as well). In addition, abuse (generally a direct action) and neglect (generally a failure to act) are different concepts that should also be addressed separately. Cf. In re T.G., 965 S.W.2d 326, 334 (Mo.App. W.D.1998) (definition of abuse used in termination of parental rights) and K.M.C., III, 223 S.W.3d at 925 (citing the definition of neglect used in termination of parental rights cases). Given that a fundamental right is ultimately at issue; the clear and convincing standard of proof contains within itself a requirement that opposing evidence be considered; and our review is not impeded by the multifarious nature of the point; we will address Mother's claims on the merits while noting here that "best practice would dictate that each challenge should be asserted in separate points relied on. Separating the two challenges in this manner assists an appellant in presenting a clear, cogent, and concise argument for each relying only upon the view of the evidence relevant to that particular challenge." Houston, 317 S.W.3d at 187 n. 9.
[7] Section 211.447 was amended in 2007 to insert a new subsection 3; what was subsection 4 at the time of the opinion in K.A.W. has not changed in substance but is now numbered as subsection 5.
[8] mOTHER DID NOT ADDRESS THE PROBATIVE FORCE of Wells' testimony that Wells would recommend additional counseling for Mother if Mother would not admit injuring Child and she was in fact the person who hurt Child. We considered whether this evidence supported the judgment and we find that Wells' testimony on this issue does not demonstrate a likelihood of future harm because Wells did not state such a likelihood (nor recommend termination based on a future concern) and instead recommended increasing supervised visits over time with a later assessment of whether unsupervised visits were warranted. Likewise, Mother did not address the impact of Reiutz's testimony that that if he knew that there was a serious anger issue that caused the injuries, he might have addressed such an issue differently in counseling. We find that this testimony did not demonstrate a likelihood of future harm because Reiutz did not testify as to the actual risk of future harm and, further, he did not see any evidence of an anger issue during the counseling he provided.
[9] The decision in K.A.W. discussed consideration of future harm in the contexts of abuse and neglect; failure to rectify, and unfitness to parent. 133 S.W.3d at 10.