In the Interest of: X.D.G., Minor.

**Greene County Juvenile Office,
Petitioner–Respondent,**

v.

**K.D.G., Natural Father, Respondent–
Appellant.**

No. SD 30860.

Missouri Court of Appeals,
Southern District,
Division One.

May 19, 2011.

Rehearing Denied June 1, 2011.

Application for Transfer Denied
June 28, 2011.

John E. Kelly, Springfield, MO, for Appellant.

Bill Prince, Springfield, MO, for Respondent.

BARNEY, P.J., LYNCH, J., and BURRELL, J.

PER CURIAM.

K.D.G ("Father") appeals that portion of a judgment of the juvenile division of the circuit court ("the trial court") that terminated his parental rights to and over his young child, X.D.G. ("Child") on the

grounds of abuse and/or neglect and a failure to rectify the conditions that caused Child to come into alternative care ("failure to rectify"). *See* section 211.447.6.[1] In three points relied on, Father asserts the trial court's abuse/neglect and failure to rectify findings were not supported by substantial evidence and were against the weight of the evidence; and that the trial court abused its discretion in finding that termination was in Child's best interest.

In *In re X.D.G.*, 340 S.W.3d 607 (Mo. App. S.D.2011), we reversed the portions of the trial court's judgment that terminated the parental rights of Child's mother ("Mother"), who separately appealed. As in Mother's case, our review of the record convinces us that the trial court's findings as to both abuse/neglect and failure to rectify were not supported by the necessary substantial evidence of a convincing link between Father's past behavior, his conduct at the time of the termination trial, and the trial court's prediction of the likelihood of future harm. *Id.* at 609 (citing *In re K.A.W.*, 133 S.W.3d 1, 11 (Mo. banc 2004)). For that reason, we also reverse the judgment insofar as it terminates Father's parental rights.

## Factual Summary

The action to terminate the parental rights of Father and Mother ("the parents") was brought in a single petition and addressed in a single trial. The findings and conclusions set forth in the trial court's judgment necessarily addressed evidence related to both parents. Much of that evidence was set forth in *X.D.G.* 340 S.W.3d at 609–14 and will not be repeated here. To summarize, at approximately seven weeks of age, Child was discovered to have suffered fractures to the tibia bones in both legs and the ulna bone in his left arm. *Id.* at 609–11. Neither parent admitted either causing these injuries or knowing how they had occurred. Both parents admitted that the injuries must have occurred while Child was in their care. After Child was placed into protective custody, the parents began complying with court-ordered services plans that required them to, among other things, submit to psychological evaluations, participate in individual and couple's counseling, and attend parenting classes. *Id.* at 610–12, 614.

Concerning Father, Dr. Mark Bradford, a psychologist, testified that he performed a psychological evaluation of Father and observed that Father had a positive attitude toward change and therapy, was cooperative, and suffered from no major psychosis or debilitating mental disorder. According to Dr. Bradford, after being involved with the juvenile "system," Father was "somewhat suspicious and paranoid of the whole process[.]" He said Father "had some narcissistic injury over all this, and it probably came out early on, and that probably did not help him early on." Dr. Bradford testified that Father acknowledged making mistakes, feeling regret, and having an awareness that he needed to correct his mistakes.

Father's individual counselor at the time of trial, Julian Tillman, testified that he had met with Father 32 times, and they had worked on "[d]ealing with denial of harm to [Child], denial of his wife's part that she may have played in harm to their child, any type of emotional issues, such as anger issues, and then just the stress related to this process as it goes along." When asked if his treatment would have been different if Father had admitted hurting Child, Tillman replied, "Most certainly." Tillman testified that if that had been the case they would have worked to

---

1. Unless otherwise indicated, all statutory references are to RSMo Cum.Supp.2009.

determine Father's psychological state at the time of the injuries and plan additional treatment based upon that determination. If Father had admitted instead that he knew Mother had caused Child's injuries, the course of treatment would have differed yet again—focusing instead on the psychological state that had contributed to Father's previous denial of this knowledge. Tillman also testified that if Father had either injured Child himself or falsely denied having knowledge of who had, and Tillman eventually learned of it, then it was Tillman's opinion that the trust necessary for the patient-counselor relationship would be affected. If such an event damaged that trust beyond repair, the acquisition of a new counselor would be necessary.

Tillman testified, however, that Father never gave any indication that he had injured Child or knew that Mother had done so. Tillman also testified Father gave no sign that he was codependent on Mother to such a degree that he could not protect Child. Instead, Tillman observed signs in Father of regret and remorse based on Father admitting "many times" that he needed to be more vigilant as to Child. Tillman did not see any "anger issues" in Father. The only treatment goal Tillman set that he did not view as fully satisfied was one of personal growth; and Tillman testified that because the case was ongoing, there could still be stress and depression issues related to it that would have to be worked through.

Tillman testified that Father completed a course on fatherhood, and Father was doing a workbook with Tillman that focused on future parenting strategies in view of past issues. Tillman confirmed that Father had followed his recommendations and took initiative in treatment by enrolling himself in a parenting class, attending it, and then bringing in the certificate verifying his completion of the class. Tillman testified that Father had developed from a tendency toward self-involvement to being outwardly aware and was also more involved in Child's physical care. Tillman stated, "Everything that we've talked about for the last 13 months shows me that [Father] wants to provide a safe environment for [Child] in [the parents'] home."

Without objection, Tillman responded as follows to an inquiry from Father's attorney.

Q. Do you have any indication to show that he has been untruthful with you in any way?

A. No, ma'am.

Q. Do you believe—Do you see any red flags which would indicate to you that [Father] would harm his son?

A. No, ma'am.

Q. Do you see any red flags that would indicate to you [Father] would not protect his son?

A. No, ma'am.

Q. Do you stand by your recommendation based upon information you have that he has been cooperative, completed his treatment goals and should be allowed more contact with his son to have an opportunity to show if he could get him back in his home?

A. Yes, ma'am.

The deposition of Father's original therapist, Mindy Ellis, was admitted as Exhibit 7 at trial. Her testimony was that she met with Father for five counseling sessions between September and October 2008. She said that during their initial meeting, Father discussed four different explanations for injuries to Child and then gave three additional "possible" explanations for the fractures in their next session. She stated that during their third session, Fa-

ther "had spoken to [Wife] about some of his concerns, and he talked about his concerns with her temper." She quoted Father as saying, "[Mother] is a spitfire with a temper." She testified that Father reported having a verbal altercation with Mother in the parking lot after one of their sessions. She said Father told her that he did not think Mother

had learned to control her temper. He has a hard time talking with her about his concerns and issues about these things. Talked about her self-consciousness and things like that. He did state at this point that he didn't want to believe that [Mother] hurt the baby but thought maybe she did.

She also testified that she set a goal for Father that he call Child by his name instead of "the baby" or "the boy."

When asked why there were no sessions with Father after October 15, 2008, she said,

Many reasons. One was there continued to be repeated misunderstandings with him on what was said in session, even the simplest of things, such as scheduling appointments. And in the prior session I had told him and set some boundaries that any more misunderstandings and therapy would be terminated.

We also had an FST[2] where I attended by phone, and I believe Mr. Phil Marsh was the family therapist or marriage therapist at the time referred [sic] to me to [sic] a derogatory manner. And I just—it damaged the therapeutic relationship, and I didn't think it was going to work anymore.

On or about October 22, 2008, she wrote a "final letter and report to the team at the time about [her] therapy with [Father]." The letter was offered as Deposition Exhibit 1, and the Guardian ad Litem ("GAL") followed up on the matter as follows:

Q. I'm [GAL's name]. I'm the GAL. On page 2 of Exhibit 1, the first paragraph, the third sentence you wrote: He has stated he knows she hurt the baby, comma, but doesn't want to know it. Is that a direct quote from [Father]?

A. Yes.

The letter indicated that Mindy Ellis thought it was unfortunate that she would no longer be treating Father "because [she] felt [Father] had potential to truly progress and gain insight in therapy." The letter also stated her opinions regarding Father's concerns about Mother, exclusive use of "the baby" and "the boy" to refer to Child, and a lack of empathy for Child. During her deposition, she admitted that she had "no idea[ ]" of anything Father had done in therapy since she last saw him in October 2008.

Mother's counselor, Joan Wells, testified that Mother was initially counseled by Marcia Ellis before she switched to Wells. The Children's Division caseworker at the time of trial, Jeremy Elliott, testified that his understanding of this change in therapists in late 2008 was "based on reports from two therapists, Mindy and Marcia Ellis, no relation. They reported there was a conflict, as far as them discussing the case without [the parents'] knowledge, together."

The GAL questioned Tillman (Father's individual counselor) about conversations Tillman had with Father about Father's

2. We presume this was a reference to Family Support Team meetings as other witnesses indicated that such meetings had taken place.

denial of a statement attributed to him in Mindy Ellis's letter as follows:

Q. Okay. Did you follow up with that denial?

A. Yes, sir.

Q. Did you say, "Why would somebody say you said this?"

A. If I can explain it this way—

Q. Sure.

A.—he has stated that he felt pressured throughout his treatment with the former therapist, and upon one particular—In a particular session, he felt—he felt pressured to the point that, on two occasions, two different occasions in my office, [Father] has stated that the therapist made the statement, "I just want"—"I just want to hear you say that you know your wife hurt your son." And the second time that we discussed this, [Father] stated that he contacted the caseworker, [ ] to let him know that that had happened in his session.

Q. So according to [Father], he did not make the statement himself, but he was pressured to by his therapist to make that statement.

A. And—Right. And if I could go one step further, he's indicated to me that he never made that statement, that the pressure was given but he never complied to [sic] that pressure to make that statement. He has indicated that—that he and his former therapist discussed the possibility that his wife would have hurt their son. He and I have even had those conversations, that there is a possibility that his wife or another—as [Respondent's attorney] has asked, another person would have hurt [Child].

When Father testified, his attorney asked whether he told Mindy Ellis that he knew Mother had injured Child. Father replied, "No." When asked why he thought Mindy Ellis would report that he had, Father testified that "the only thing that I can think of, I did make one comment that I would be naive if I didn't consider the possibility that she could have done it, but I do not believe that she did it." During Respondent's cross-examination of Father, the following exchange occurred.

Q. I just want to ask you about one question that [Mindy Ellis] answered. I think I asked the question about how did he, referring to you, describe your relationship with his (sic) wife, and her response in the deposition was, well, he discussed that she was a volatile person, and he was concerned about her anger and her temper, and he had a hard time talking with her. That's a bit inconsistent from what your previous testimony was, about not really being all that concerned about any sort of temper issues, right?

A. Right.

Q. Did you ever tell Mindy [Ellis] that?

A. I do not recall saying anything like that.

Q. You think she just made it up?

A. It's—I don't—I don't want to deface [sic], you know, another person, especially when they can't be here to defend themselves [sic], but I don't know where she could have gotten that.

Father did recall an incident on the third night after Child was taken into protective custody where several people were present, including Mother, Father's own mother, and the foster parents. Father acknowledged that Mother was angry at this meeting but said that "all parties in-

volved were angry with each other." Father said he possibly told Mindy Ellis about this incident.

Elliott testified that Father was not asked to submit to any additional drug tests after the first one came back negative, that he had no concern that Father abused drugs, and that he was not aware of any law violations by Father. Elliott testified that Father visited Child, maintained a stable residence, attended both individual and couple's counseling, completed two psychological evaluations, attended parenting classes, provided in-kind and financial support for Child (although Father was contesting the amount of his child support order), and cooperated with him regarding releases of information. Elliott testified that in terms of the treatment plan, Father had done everything asked of him.

### Analysis

Father presents three points relied on that are nearly identical to those asserted by Mother, claiming that the trial court's findings of abuse and/or neglect and failure to rectify were not supported by substantial evidence and were against the weight of the evidence and that the trial court abused its discretion by finding that termination was in the best interest of Child.[3] As in Mother's case, the necessary support for the trial court's findings on both abuse and/or neglect and failure to rectify come down to the presence or absence of evidence of a link between Father's past behavior and the trial court's prediction of the likelihood of future harm

to Child. Thus, we consider whether the additional trial evidence regarding Father supports the existence of that link.[4]

To be supported by substantial evidence, the evidence must have the degree of probative force required to meet the burden of proof. *See Houston v. Crider*, 317 S.W.3d 178, 187 (Mo.App. S.D. 2010) (the last step in a review for substantial evidence requires appellant to show that the evidence and reasonable inferences in support of the judgment "does not have probative force upon the proposition such that the trier of fact could not reasonably decide the existence of the proposition"). In termination of parental rights cases, the standard is clear, cogent and convincing evidence—evidence that instantly tips the scales "in favor of termination when weighed against the evidence in opposition and the finder of fact is left with the abiding conviction that the evidence is true." *K.A.W.*, 133 S.W.3d at 12.

Statutes governing termination must be construed in favor of the parent as the right to raise a child is a constitutionally protected, fundamental right. *In re W.C.*, 288 S.W.3d 787, 794–95 (Mo.App. E.D.2009). There must be a "convincing link" between a parent's past acts and his predicted behavior in determining the likelihood of future harm. *K.A.W.*, 133 S.W.3d at 9–10; *In re S.M.H.*, 170 S.W.3d 524, 533 (Mo.App. E.D.2005); *In re K.W.*, 167 S.W.3d 206, 210 (Mo.App. E.D.2005).

Mindy Ellis's deposition testimony sufficiently supports the propositions that

---

3. As did Mother, Father improperly combined what should have been separate claims of error—asserting in a single point that the judgment was not supported by substantial evidence and was against the weight of the evidence. As our analysis of Father's points would mirror what we set forth in Mother's case, it will not be repeated here.

4. As we ultimately answer this question in the negative, we do not reach Father's best interest challenge. *See In re C.A.L.*, 228 S.W.3d 77, 85 n. 8 (Mo.App. S.D.2007) ("An appellate court, like the trial court, can reach the issue of best interests of the child only after a determination that one or more of the statutory grounds for termination exist").

Father told her that he believed Mother had injured Child, that Father expressed concerns about confronting Mother, that Father displayed a lack of empathy for Child, that Father used the monikers "the boy" and "the baby" when referring to Child, and that Father often misunderstood things that happened in their counseling sessions. Based on this evidence, the trial court could have found that Father knew that Mother had injured Child; that Father was afraid to confront Mother; and that Father had not fully bonded with Child as of October 2008 as the trial court was free to believe none, some, or all of a witness's testimony.[5] *In re B.C.K.*, 103 S.W.3d 319, 322 (Mo.App. S.D.2003). But assuming as true all of Mindy Ellis's negative testimony about Father, it was simply insufficient to establish the necessary convincing link between Father's past behavior, his circumstances at the time of trial, and the trial court's prediction of Father's future dangerousness. Mindy Ellis last treated Father approximately fifteen months before trial commenced and before Father had engaged in counseling with Tillman. She admitted that she had no idea what Father might have accomplished in therapy since she last saw him. She provided no evidence that, as of the time of trial, Father was likely to either harm Child or fail to protect him.

Tillman's testimony was largely favorable to Father, with the possible exception that he would have directed a different course of therapy if Father had either admitted injuring Child himself or admitted knowing that Mother had injured Child. Tillman's testimony also failed to provide a convincing link between Father's past and present behavior and a likelihood of future harm. Assuming, *arguendo*, that Father either injured Child or knew who

did and had refused to disclose it, Tillman simply testified that such a situation would have caused him to modify Father's treatment—he did not testify that this modified course of treatment would have been ineffective in reducing the likelihood of future harm or that Father presented a risk of harm to Child because he did not receive this different type of treatment. In contrast to these hypothetical possibilities was Tillman's testimony that his actual observations of Father gave him no reason to believe that Father would harm Child or fail to protect him. Tillman's recommendation was that Father be granted an opportunity to spend more time with Child to help determine whether Child should be returned to Father's care.

While the trial court was certainly entitled to disbelieve some or all of Tillman's testimony, *B.C.K.*, 103 S.W.3d at 322, disregarding evidence favorable to Father is not the equivalent of finding evidence against Father. Finally, adding in the other evidence discussed at length in *X.D.G.* does not cumulatively result in substantial evidence convincingly linking Father's past and present behavior to a likelihood of future harm. "No evidence was presented that a failure to explain or admit culpability for Child's injuries was the equivalent of evidence of future dangerousness." 340 S.W.3d at 622.

After a full review of the record, we see no clear, cogent and convincing evidence that supports the trial court's prediction that Father is likely to either harm or to fail to protect Child in the future. To the extent that they challenge the sufficiency of the evidence supporting termination, Father's points are granted. The trial court's judgment as it pertains to the ter-

---

5.  For the same reason, the trial court was free to reject her other testimony that ac-

knowledged Father's "potential to truly progress and gain insight in therapy."

mination of Father's parental rights to and over X.D.G. is reversed.