In the Interest of T.G., T.G., A.G., C.G. and K.G. Plaintiffs.

David W. KIERST, Jr., Juvenile Officer, Respondent,

v.

A.O.G. (Natural Father) Appellant.

Nos. WD 53859–WD 53863.

Missouri Court of Appeals, Western District.

Submitted Sept. 2, 1997.

Decided Feb. 24, 1998.

Motion for Rehearing and/or Transfer to Supreme Court March 31, 1998.

Application for Transfer Denied May 26, 1998.

John R. Mencl, Independence, Kyla Grove, Guardian Ad Litem, Kansas City, for appellant.

Laurie Snell, Kansas City, for respondent.

Before SMART, P.J., and LOWENSTEIN and LAURA DENVIR STITH, JJ.

PER CURIAM.

A.O.G. ("Father") appeals the termination of his parental rights to his five children, T.G., C.G., A.G., K.G., T.G. (hereafter referred to as "Ty.G." to prevent confusion with the other "T.G."), by the Jackson County Circuit Court through orders dated December 19, 1996. He claims on appeal that: (1) the trial court erred in granting the two oldest children waivers from testifying at the proceedings and in admitting Division of Family Services ("DFS") reports containing hearsay testimony; (2) there was insufficient clear, cogent, and convincing evidence that grounds for termination exist; and (3) there was insufficient evidence that termination was in the best interests of the children. We affirm the trial court's orders of termination.

## I. Factual Background

On March 26, 1994, A.O.G. ("Father") shot and killed his wife, the mother of the children ("Mother"), with a single shotgun blast while she was holding Ty.G., then a baby, in her arms and in full view of the other children in the family home. The shotgun blast pelted Ty.G. with shotgun pellets and he fell to the floor with his slain mother.

The incident inflicted serious physical injuries on Ty.G. Father then left the children alone with Mother's corpse and their injured baby brother. Father admitted to officers of the Kansas City, Missouri, Police Department that he had just killed his wife. The State indicted Father for second-degree murder. The children were taken in by Mother's grandparents, in whose home they have remained continuously since the fall of 1994.

In the subsequent criminal prosecution for the murder of his wife, Father claimed that he was under the influence of PCP at the time he shot his wife. In an order dated April 12, 1995, the court found Father not guilty by reason of insanity and consequently committed Father to the Department of Mental Health, in whose custody he has since remained.

The children were taken under the jurisdiction of the Family Court pursuant to amended petitions filed with the Family Court on June 30, 1994, which alleged that the children were without proper care, custody, and support in that their mother had been murdered and their father had been arrested in connection with the murder, to which he had confessed. The amended petitions also alleged that Ty.G. sustained a gunshot wound to the chest and a buckle fracture to his left thigh, injuries that were consistent with his having been held by his mother at the time she was shot to death. On August 2, 1994, the Family Court entered an order finding jurisdiction pursuant to § 211.081, RSMo 1994.[1] In that order, the Family Court adopted the allegations of the amended petitions by stipulation of Father. The Father stipulated that Kansas City police officers would testify that he made statements admitting to the shooting of his wife. The Family Court specifically found such stipulation sufficient to sustain the allegations in the amended petitions.

The Juvenile Officer of Jackson County filed petitions for termination of Father's parental rights to the children on December 27, 1995. A trial was held on December 11,

1. Unless otherwise indicated, all statutory references are to the Missouri Revised Statutes of 1994.

1996. The Juvenile Officer presented two witnesses, Pam Anderson, the children's Division of Family Services ("DFS") caseworker, and Carol Kimball, the children's therapist. At the time of trial, the children's ages ranged from 3 to 8.

Pam Anderson testified that she had been the children's DFS caseworker since November 3, 1994. Ms. Anderson conceded that she had not had direct contact with Father since she visited him in the Jackson County jail on April 13, 1995, in order to get his signature on a Written Service Agreement. Ms. Anderson testified that, although Father had complied with all of the practical terms of the service agreement, the DFS nevertheless decided to recommend termination rather than family reunification because of the severity of the act of emotional abuse inflicted upon the children by Father's slaying of the children's mother. A referral was sent to the Legal Unit of the Family Court on September 13, 1995.

Carol Kimball, a private therapist, testified that she had been the children's therapist since February of 1995, and that all of the children had suffered physically and emotionally. According to Kimball, all of the children except Ty.G., the youngest, were suffering depression as a result of their mother's death. All of the children but the youngest exhibited symptoms of Post Traumatic Stress Disorder. Those symptoms were manifested in T.G. through his play, developmental delays, bed wetting, severe withdrawal, and deep depression. K.G.'s symptoms consisted of bed wetting, severe withdrawal, and spontaneously making statements such as, "Did you know my daddy killed my mommy?" Those symptoms were exhibited in C.G. by physical and psychological distancing at home and school, bed wetting, and severe withdrawal. A.G.'s traumatic stress manifested itself in acts of physical aggression against both people and property, bed wetting, and severe withdrawal. Ty.G., the youngest, was said by Kimball to be the best adjusted of the children because he was too young at the time of the shooting to recollect the event. Kimball testified that Ty.G. had no concept of a mother or father, and predicted that Ty.G. would realize as he grew up that he had no mother, "and then there will be some issues there."

Under the Written Service Agreement Father signed in April 1995, Father was to have no verbal or physical contact with the children until therapeutically recommended otherwise. Although Father had unauthorized telephone contact on at least one occasion with the children while they were visiting his relatives, no contact was recommended until later that fall, and in February of 1996, Carol Kimball read a letter from Father to the children after having determined that the contents were appropriate. Kimball testified that the younger children showed no interest in the letter and that the eldest, A.G., seemed upset by the letter. Subsequent letters were not read to the children based on Kimball's determination that the subject matter was inappropriate. Specifically, those letters mentioned the possibility of reunification, which Kimball believed would be disruptive given the DFS decision to pursue the termination of Father's rights.

Kimball testified that A.G., the oldest child, was the child with the strongest emotional bond with his Father. The other children, Kimball observed, spoke very little about their Father, and the youngest children, T.G. and Ty.G., were said to have no conception of what a parent is. As a result of their traumatic experience, Kimball observed, all of the children have had to overcome fear of death and the older children have had to overcome fear of adult authority figures, including their father. For a time, A.G. was frightened that a maternal uncle was going to abuse him, and C.G. had dreams about Father coming back and killing her.

Kimball testified that the children were improving, but that the degree of emotional abuse was still unknown at that time. Kimball told the court that the children will continue to suffer and will have great difficulty coping with their father's killing of their mother for the rest of their lives. Kimball recommended that the children be in a stable and secure home that reinforces their sense of safety and security. Specifically, Kimball recommended that the children remain permanently with their Mother's grandparents,

who had expressed interest in adoption. Further contact with their father, Kimball maintained, would disrupt the children's growing sense of security in their current home environment.

Father's witnesses consisted of three people who were familiar with Father from his institutionalization, Kenneth West, Dr. Deja Suthicant and Janice Aldridge, as well as Father's stepbrother, Ewing Minor, and Father himself.

Kenneth West, a clinical psychologist, testified that he had been conducting weekly counseling sessions with Father since July of 1996. West stated that Father had not shown any signs of mental illness since the counseling started. He also opined that Father was no longer psychotic. According to West, Father had a deeply-held set of religious convictions, which were reflected in his views towards parenting. West expressed his view that Father presented no danger to the children. On cross-examination, West testified that Father had never mentioned his killing of his wife or abuse or neglect of the children during the counseling sessions. West admitted that he had no idea as to the emotional state of the children.

Dr. Suthicant observed that Father had tested negative in every drug screening conducted since his arrival at St. Joseph, and testified that Father had finally accepted, after some difficulty, that drug addiction is a life-long problem. It was Dr. Suthicant's opinion that Father was no longer psychotic. Dr. Suthicant also offered his opinion that the children would be better able to resolve their feelings regarding their father if they were able to see and speak with him. On cross-examination, however, Dr. Suthicant conceded that he had never met the children.

Janice Aldridge, a member of Father's treatment team at St. Joseph State Hospital, testified that Father had been a very cooperative patient. She considered Father's interest in his children sincere. Aldridge testified that Father's treatment team would urge Father's conditional release on a trial basis in June of 1997. If Father successfully participated in the trial release program, Aldridge explained, the staff would recommend Father's permanent placement in an apartment program. On cross-examination, Aldridge admitted that she knew nothing of the children's situation.

Ewing Minor, Father's stepbrother, admitted that he had done drugs with Father in the past. He claimed that he had stopped using drugs since becoming a Jehovah's Witness, and testified that he had spoken to Father about the immorality of drug abuse. Minor promised that he would help Father stay the straight and narrow path after he was released. Minor also testified that he thought that Father had been a good provider of financial support for his children. On cross-examination, Minor testified that he was unaware of any abuse within the family. He also testified that he was not aware that Father had provided no support for his children since starting work in St. Joseph.

Father testified at the termination hearing. He claimed that he would never have killed the children's mother had he not been on drugs, and that he now fully understood the perils of drug abuse. Father stated that he thought his own life experience would help him educate his children about the folly of drug abuse. Father conceded that, although he had a paying job at the institution's library and had control over his account, he had provided no support for his children. He provided no explanation for this failure to contribute to the support of his children.

After taking the case under submission, the trial court granted the petitions terminating Father's parental rights as to all of the children in orders dated December 19, 1996. As grounds for termination, the trial court cited the 1994 adjudication that the children had been abused and/or neglected and specifically cited both § 211.447.2(2)(c), finding Father's killing of the children's mother in front of the children to be a severe act of emotional abuse, and § 211.447.2(2)(d), finding that Father failed to provide any financial contribution to the support of his children since he was financially able to do so starting in Spring of 1996. Noting such factors [2] as the lack of emotional ties between

2. These factors were taken from § 211.447.3, which mandates that the court making a termi-

Father and the children, the lack of regular contact between them, Father's failure to provide financial support to the children, and the slaying of their mother as a severe and deliberate act of emotional abuse, the court found that termination would be in the best interests of the children. Father now appeals the termination.

## II. Standard of Review

On appeal from a termination order, we will sustain the order of the trial court unless there is no substantial evidence to support it, unless it is contrary to the weight of the evidence, or unless it erroneously declares or applies the law. *In Interest of B.B.B.*, 905 S.W.2d 118, 121 (Mo.App. 1995). We will reverse the order to terminate only if we are left with the firm belief that the order was wrong. *In Interest of J.M.L.*, 917 S.W.2d 193, 195 (Mo.App.1996). In our appellate review of the termination order, we view the facts presented in evidence and the reasonable inferences therefrom in the light most favorable to the trial court's judgment. *In Interest of D.A.H.*, 921 S.W.2d 618, 621 (Mo.App.1996).

## III. Waiver

Father first alleges that the trial court erred in waiving the requirement that the two oldest children, A.G. and C.G., testify. He also challenges the admission of hearsay contained within the reports of Kimball and Anderson. We turn first to the waiver of testimony by the two oldest children.

So long as there is some basis for concluding that it would be detrimental to the child's best interests to testify, it is within the trial court's discretion to waive the requirement that the child testify. *In Interest of S.J.*, 849 S.W.2d 608, 613 (Mo.App. 1993).

In deciding not to require that any of the children testify, the trial court expressly based its decision on the ages of the children at the time of trial and at the time the slaying occurred. The trial court also relied upon the testimony of Carol Kimball, the

children's therapist, that, given the age of the children (the two oldest were eight and seven) and their continuing emotional traumatization, it would not be in the best interests of the children to be required to testify. Acknowledging that Carol Kimball testified that the children's best interests would not be served by testifying in court, the Father points out that, Kimball is neither a psychiatrist nor a psychologist. We fail to see that her lack of a psychiatry or psychology degree disqualifies her from providing helpful insight to the court. Carol Kimball is a licensed social worker and an experienced therapist who had provided therapy to the children for almost two years. The trial court could reasonably choose to credit her testimony more than the testimony of Father's experts, none of whom had ever personally met the children. We see no abuse of discretion.

As to Father's argument that the termination reports of Kimball and Anderson should have been excluded from evidence because they contained inadmissible hearsay, we note that the same issue was also confronted by this court in *In Interest of S.J.*, 849 S.W.2d at 612. Observing that Missouri statute, § 211.455.3, mandates the preparation and admission of such reports into evidence, we held that the trial court did not err in admitting the reports into evidence over appellant's hearsay objection. *Id.* The trial court in the instant case allowed the reports in as part of the report mandated by § 211.455.3. Finding *S.J.* dispositive on this point, we see no error in the admission of the reports.

## IV. Grounds for Termination

Before a court may terminate parental rights, the court must find (1) that there exists one or more of the statutory grounds for termination, and (2) that termination would be in the best interests of the child. § 211.447.2. The evidentiary standard for proving the existence of the statutory grounds for termination is "clear, cogent, and convincing evidence." § 211.447.2.

nation decision first evaluate and make findings regarding such factors where applicable.

The two principal grounds for termination under statute are abandonment, § 211.447.2(1), and abuse or neglect, § 211.447.2(2). If a child has been adjudicated to have been abused or neglected, the trial court making a termination decision is instructed to consider and make findings regarding four factors, the third of which is

[a] severe act or recurrent acts of physical, emotional or sexual abuse toward the child or any child in the family by the parent, including an act of incest, or by another under circumstances that indicate that the parent knew or should have known that such acts were being committed toward the child or any child in the family ...

§ 211.447.2(2)(c). The fourth factor is

[r]epeated or continuous failure by the parent, although physically or financially able, to provide the child with adequate food, clothing, shelter, or education as defined by law, or other care and control necessary for his physical, mental, or emotional health and development ...

§ 211.447.2(2)(d). In the present case, the trial court found that the children were adjudicated to have been abused and/or neglected and therefore the court considered the four factors under § 211.447.2(2). The court found no evidence regarding the first two factors under 211.447.2(2), but did find clear, cogent, and convincing evidence of the existence of the third and fourth factors. On appeal, Father challenges the sufficiency of the evidence supporting the trial court's findings as to these last two factors. We will consider each factor separately after considering the applicability of "abuse or neglect" as a grounds of termination.

■ Father does not specifically allege on appeal that the children had not been adjudicated as having been abused or neglected. Instead, he claims that because the outcome of the criminal prosecution for shooting Mother establishes that he was not criminally responsible for his actions at the time, we must discuss the applicability of "abuse or neglect" as a grounds for termination. The Family Court found clear, cogent, and convincing evidence of abuse and/or neglect of the children in its orders

dated October 3, 1994. Whatever defense Father later offered in the criminal prosecution arising from the shooting, it does not alter the fact that the children were adjudicated to have been abused and/or neglected by the Jackson County Family Court on October 3, 1994. Section 211.447.2(2) was clearly applicable to this case.

■ The trial court found clear, cogent, and convincing evidence of a severe act of abuse under § 211.447.2(2)(c) in the form of Father's admission that he shot the children's mother to death in front of the children, indeed, while the mother was holding one of the children, Ty.G., in her arms. On appeal, Father claims that the evidence of abuse was insufficient, because of his alleged absence of any intent to harm his wife due to PCP use. He argues that the State's acceptance of his plea of not guilty of second degree murder by reason of mental disease or defect excluding responsibility made the shooting a purely accidental event rather than an act of abuse.

■ Implicit in Father's argument on appeal is the assumption that the Juvenile Officer is collaterally estopped from arguing that Father's shooting of the children's mother was in any way intentional. This assumption is ill-founded. For collateral estoppel to apply, the following four conditions should be met: (1) the issue decided in the prior adjudication was identical to the issue in the present action, (2) the prior adjudication resulted in a judgment on the merits, (3) the party against whom collateral estoppel is asserted was in privity with or a party to the previous adjudication, and (4) the party against whom the bar is asserted had a full and fair opportunity to litigate the issue in the prior proceeding. *King Gen. Contractors, Inc. v. Reorganized Church of Jesus Christ of Latter Day Saints*, 821 S.W.2d 495, 500 (Mo. banc 1991). In this case, we need look no farther than to examine whether the first condition is applicable. The issue of whether Father had the *mens rea* to be held criminally liable for Mother's shooting is not identical to the issue of whether the act was an act of "abuse" under the termination statute. The inquiry into whether an act was

"abuse" within the meaning of the termination statute implicates concerns which are different from those of the criminal law. The criminal law inquires into *mens rea* primarily in order to determine whether a prior act was sufficiently morally blameworthy to be worthy of punishment. In contrast, the juvenile law is concerned about evidence of prior abuse in termination cases, not for the purpose of punishing those prior bad acts but for the purpose of fostering a healthy parent-child relationship. Confronted with a termination case involving abusive parents of limited mental capacity, the court in *In Interest of R.I.H.*, 842 S.W.2d 200 (Mo.App.1992), summed up the difference between termination and criminal prosecution: "A neglect proceeding and a termination proceeding are not criminal prosecutions. The focus is upon the children." *Id.* at 203.

There is also a different standard of proof in criminal proceedings, in which guilt must be shown beyond a reasonable doubt. In termination cases, the grounds for termination must be shown by clear, cogent, and convincing evidence rather than the higher standard. If the party against whom estoppel is sought had to satisfy a significantly higher burden of persuasion in the preceding action, there could be no identity of issues and the doctrine of collateral estoppel cannot apply in the second action. *See Shaffer v. Terrydale Management Corp.*, 648 S.W.2d 595, 608 (Mo.App.1983).

Father maintains that, by definition, an act is abuse only if the parent whose rights are being terminated acted with the intention of committing a severe act of abuse. We reject Father's second attempt to require a showing of criminal intent for termination on the ground of abuse. Mental state is explicitly mentioned only in § 211.447.2(2)(c) in the context of termination of the rights of a parent who "knew or should have known" that abusive acts were being committed to-

ward the child or any child in the family by another person. The literal text of the termination statute does not require the abusive parent to have had any purposeful intent to cause harm.

The word "abuse" itself is undefined in the termination statute, but Missouri's statute providing for the protection of abused children, starting at § 210.110, does define "abuse." Abuse is defined as

> any physical injury, sexual abuse, or emotional abuse inflicted on a child *other than by accidental means* by those responsible for the child's care, custody, and control, except that discipline including spanking, administered in a reasonable manner, shall not be construed to be abuse.

§ 210.110(1) (italics added). We read statutes *in pari materia*. *State v. Knapp*, 843 S.W.2d 345, 347 (Mo. banc 1992); *see also Osmun v. Osmun*, 842 S.W.2d 932, 935 (Mo. App.1992). Both the child abuse statute and the termination statute were enacted to protect the best interests of children when those responsible for their care cannot be relied on to protect them from harm. While we agree with Father that a purely accidental injury could not qualify as "abuse" under the termination statute,[3] we do not believe that it logically follows that a finding of "abuse" requires evidence of purposeful intent to harm the children.

Father protests that he should not be held responsible for exposing his children to risk of injury because his drug use rendered him incapable of rational thought at the time of the shooting. However, Father cannot be allowed to use his voluntary intoxication as an excuse for his failure to be aware of the obvious consequences of his slaying of Mother in front of the children. *Cf.* § 562.076.1; *State v. Roberts*, 948 S.W.2d 577, 588 (Mo. banc 1997).[4] Since it was

---

**3.** This approach requiring some fault on the part of parents whose rights are to be terminated for acts of abuse is consistent with the law regarding what is required for a finding of abandonment as a ground for termination. The termination statute defines abandonment in such a way as to require either (1) the leaving of the child in circumstances where the child cannot be identified followed by a subsequent failure to claim the

child or (2) leaving, without good cause, the child without provision for parental support and contact which the parent is able to provide. § 211.447.2(1)(a)-(b).

**4.** On the record before us, we do not know why the State accepted Father's plea of not guilty of second degree murder by reason of mental disease or defect. Father's voluntary intoxication

Father's own decision to use an illegal and dangerous mind-altering substance that rendered him incapable of knowing the consequences of his actions, Father cannot escape the reasonable consequences and the impact of those on his children.

As further evidence of abuse or neglect as grounds for termination, the trial court also found a repeated and continuous failure by Father, though financially able since early 1996, to provide support for the children under § 211.447.2(2)(d). Father's argument on appeal is that, to the extent the trial court ordered termination on the basis of non-support, the order conflicts with another portion of the termination statute, § 211.447.3(6), which states that "incarceration in and of itself shall not be grounds for termination of parental rights." Father's argument makes no sense. Even on the assumption that Father's institutionalization under the custody of the Department of Mental Health constitutes "incarceration",[5] the trial court did not terminate Father's rights based on the mere fact that Father is incarcerated: the trial court's finding of non-support was not based on the fact of Father's incarceration, but on the fact that, though incarcerated, Father was receiving wages for work done in the institution but nevertheless failed to contribute any amount to the support of his children. By his own admission, Father was employed in the institution's library and receiving wages for this work from February of 1996 to the time of the hearing in December of 1996. Father admitted that he had control over his account. Aside from purchasing Christmas gifts for the children, which we may ignore as infrequent contributions under § 211.447.4, Father admitted that he did not use the wages he earned in St. Joseph State Hospital to help offset the costs of raising his children. It is immaterial

should not have itself precluded a finding of *mens rea* under the authorities cited in the text. Perhaps the State thought that, even ignoring evidence of intoxication, there was too little evidence regarding the circumstances of the shooting to support the inference that Father knowingly caused the death or had the purpose of causing serious physical injury to Mother. Suffice it to say, however, that the State was free to argue in the civil proceeding for termination that Father's act was abusive.

that the State never requested that Father contribute to the support of his children. Support of minor children is a continuing parental obligation. *In Interest of M.B.A.,* 709 S.W.2d 941, 947 (Mo.App.1986).

## V. Best Interests of the Children

Father argues that the evidence was insufficient to prove that termination of his parental rights was in the best interests of the children. Reduced to its essence, Father's argument appears to be that, regardless of what he had done in the past, there was no evidence that he was likely to be abusive to his children in the future. Father points out that, since his institutionalization, he has been free from drug use. Reasoning that the evidence shows that he would not have killed Mother had he not been under the influence of PCP, Father concludes that there is no risk of a repeat occurrence, at least so long as he remains drug free. Father contends that, absent evidence that he will kill again, there is no substantial evidence showing that termination is in the best interests of the children.

Father's argument presumes that the "best interests of the child" begin and end with the guarantee that a child will not be subjected to future severe abuse. The law does not take such a narrow view of the child's "best interests." This is demonstrated by the factors the termination statute requires the trial court to consider before finding termination to be in the best interests of a child. Of the seven factors set out in § 211.447.3, only the last factor deals with actions subjecting a child to substantial risk of physical or mental harm.

Father generally dismisses the trial court's actual findings as to the children's best interests. Pursuant to § 211.447.3, the trial court

5. Although the termination statute does not define "incarceration", we doubt that the text of the provision covers treatment in a mental institution. The sentence preceding the sentence containing the word "incarceration" talks of a parent's conviction for a felony offense. The standard definition of "incarcerate" and the various words derived from it is "to imprison."

found: (1) the younger children had no emotional ties with their father on account of his institutionalization; (2) Father had had no significant contact with the children; (3) Father had provided no financial support for his children; (4) no additional services would be likely to bring about adjustment enabling return of the child to Father within an ascertainable time; (5) Father had shown a lack of interest and serious commitment to his children by failing to contact DFS regarding his children; (6) Father was currently committed to the State Department of Mental Health because of the State's acceptance of his plea of not guilty of second degree murder on account of mental disease or defect; and (7) Father had subjected the children to deliberate acts of emotional abuse that he knew or should have known subjected the children to substantial risk of mental or emotional harm.

█ As to the trial court's first finding, Father argues that the limited correspondence between him and the children proves that the children had emotional ties to him. However, there was evidence that the children, particularly the younger children, manifested absolutely no emotional attachment to Father, and that the idea for the children to send the cards to Father came from their foster parents. From the record, it appears that A.G., the oldest child, was the only child who even arguably had any emotional tie to Father, and his feelings towards Father were contradictory at best. To the extent the evidence was in dispute, the trial court weighed it and found accordingly. We cannot say that the trial court's finding was against the substantial weight of the evidence.

█ Father protests that the trial court's finding that he had not had regular contact with his children in effect punished him for complying with the Written Service Agreement, which limited his contact with his children to written communication at a time deemed appropriate by DFS. Of the five letters Father sent, only one was read to the children. The others could not be read on account of their contents, which included references to the shooting as well as promises that Father was seeking reunification, a goal

that was uncertain of attainment even prior to the DFS decision to terminate Father's parental rights. Father had been informed that he should not mention these subjects in his letters. To the extent Father was permitted contact with the children under the Written Service Agreement, he was not able to avail himself fully of the opportunity because of his failure to comply with DFS restrictions to which he had agreed. In these circumstances, this evidence suffices to show a failure to maintain regular contact with the children.

With regard to the trial court's third finding, that he had provided no financial support to his children, Father does not specifically allege any error. The undisputed evidence shows that Father had not provided any financial support to his children from the beginning of his paid employment in the St. Joseph State Hospital in February of 1996 to the date of hearing in December of 1996. This finding must stand.

█ Similarly, Father does not specifically dispute the trial court's finding that no additional services would be likely to bring about lasting parental adjustment enabling a return of children to the parent within an ascertainable period of time. While Janice Aldridge, a member of Father's treatment team, testified that the team would recommend Father become part of a conditional trial release program by the summer of 1997, the fact remains that Father's commitment to State care was still open-ended. Since his future institutionalization was indefinite in duration, reunification was clearly not likely within an ascertainable period of time.

█ Father disputes the trial court's finding that he had shown a lack of interest in the children and was not seriously committed to the welfare of his children, pointing to his letters to the children as evidence that he was interested in his children. However, § 211.447.4 authorizes the trial court to attach little or no weight to infrequent communications. Father sent five letters to the children, one of which was read to the children. As the State's witnesses testified, the content of the letter that was read to the children was upsetting to the older children

and the subsequent communications contained material that was outside the scope of subject-matter about which Father was told he could communicate with the children. While the record is sparse as to whether or not the trial court was correct in finding specifically that Father had not contacted DFS regarding his children's welfare, we note that Father's failure to provide any support to his children though able, combined with his prior use of psychosis-inducing illegal narcotics around his children, provide ample evidence sustaining the trial court's finding of Father's lack of commitment to his children.

▉ To the extent Father has shown any interest in the children, these manifestations came after the Juvenile Officer's filing of the petition for termination in December of 1995. From Father's own testimony it is clear that he still did not understand the trauma he had inflicted upon his children. In response to the question on cross-examination, "You understand that they are affected from what happened?", Father's only response was, "Yeah, I'm sure they are." Sadly, in the whole record this is Father's most explicit acknowledgement of the extremely severe damage he has inflicted on his children. Father's casual reference to "whatever it is they're going through, it may be good and it may be bad and I'm prepared to handle it whatever it is" reveals Father's lack of insight as to the children's trauma.

▉ Section 211.447.3(6) instructs the trial court to make findings as to a parent's conviction of a felony offense of such a nature that the children would be deprived of a stable home for a period of years. The trial court found no felony conviction but did find, correctly, that Father's plea of not guilty because of mental disease or defect had resulted in his commitment to the state mental health system for an indefinite period of time. Such commitment, the trial court concluded, would have the effect of depriving the children of a stable home for as long as Father was committed to the state mental health system. We cannot say such a finding was erroneous or unauthorized.

▉ Section 211.447.3(7) requires consideration of whether the parent committed "deliberate" acts the parent should have known would subject the children to a substantial risk of physical or mental harm. Clearly, Father's voluntary ingestion of PCP was just such a deliberate act.

If Father and his witnesses from St. Joseph Hospital are to be believed, Father may have already made substantial progress toward a stable, responsible life. However, the trial court was on solid ground in finding that termination would be in the best interests of these children. Due to his own disregard for his family's welfare, Father's voluntary ingestion of PCP resulted in an act that traumatized these children and left them with a terrible legacy of pain and loss. Since his commitment, Father's demonstrations of interest in his children have come primarily in response to the prospect of termination. Father has failed to provide financial support to his children since becoming able to do so in early 1996. The trial court's finding that termination of Father's parental rights was in the best interests of these children was supported by evidence that was both substantial and overwhelming in weight.

## VI. Conclusion

The trial court did not abuse its discretion when it granted A.G. and C.G. waivers from testifying in the termination proceeding. In admitting into evidence the DFS reports prepared in connection with the termination proceeding, the trial court did not err. Clear, cogent, and convincing evidence showed the existence of abuse or neglect as a grounds for termination, and substantial and overwhelming evidence supported the trial court's finding that termination was in the best interests of these children.

The orders terminating Father's parental rights to T.G., T.G., C.G., A.G. and K.G. are hereby affirmed.