**In the Interest of C.M.H.,
and S.F.H., Minors,**

**Greene County Juvenile Office,
Petitioner–Respondent,**

v.

**C.N.B., Mother, Respondent–Appellant.**

**Nos. SD 32472, SD 32474.**

Missouri Court of Appeals,
Southern District,
Division Two.

Sept. 18, 2013.

Arthur E. Olson, Springfield, MO, for Appellant.

William C. Prince, Springfield, MO, for Respondent.

DON E. BURRELL, J.

C.N.B. ("Mother") appeals the judgments terminating her parental rights in, to, and over her children, C.M.H. and S.F.H. ("the children"). Because the relevant facts and legal issues are nearly identical, we address both appeals in this con-

solidated opinion.[1] *See* section 211.447.[2] In five points relied on, Mother contends the trial court erred in terminating her parental rights because there was: (1) insufficient evidence that Mother had neglected the children; (2) no evidence that Mother had abused the children;[3] (3) insufficient evidence that Mother failed to rectify the conditions "which led to the assumption of jurisdiction ... and there is little likelihood that those conditions can be remedied at an early date so that the [c]hildren could be returned to [Mother] in the near future" ("failure to rectify"); (4) insufficient evidence that termination of parental rights was in the best interests of the children when "termination would deprive the [c]hildren of future rights to support and inheritance" and end "the mother-child relationship with no foreseeable replacement for the [c]hildren"; and (5) a "violation of Mother's due process rights under the [Fourteenth] Amendment to the U.S. Constitution and Article 1 of the Missouri Constitution" in "not explor[ing]" "less drastic alternatives to termination[.]"

Under the rare circumstances present in this case,[4] we find Mother's fourth point to have merit. The trial court abused its discretion in concluding—based on its factual findings and the evidence adduced at trial—that the termination solely of Mother's parental rights was in the best interests of the children. As a result, we reverse the judgments and remand the cases for further proceedings consistent with section 211.477 and this opinion.[5]

### Applicable Principles of Review and Governing Law

■■■ We will affirm a judgment terminating parental rights

unless the "record contains no substantial evidence to support the decision, the decision is against the weight of the evidence, or the trial court erroneously declares or applies the law." *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976). *See also* [*In the Interest of*] *A.S.W.,* 137 S.W.3d [448,] 452 [ (Mo. banc 2004) ]. As a practical matter, this means the judgment will be reversed "only if we are left with the firm belief that the order was wrong." *In the In-*

1. The matter was heard by a Family Court Commissioner, whose recommendations were adopted in judgments entered by a circuit judge. We refer collectively to these judicial officers as "the trial court."

2. Unless otherwise indicated, all statutory references are to RSMo Cum.Supp.2012.

3. The judgments find that "the child[ren] [were] abused and/or neglected by [Mother]." Our review of the record reveals that the trial court did not find that Mother had abused the children. We regard "abuse (generally a direct action) and neglect (generally a failure to act) [as] different concepts[.]" *In re X.D.G.,* 340 S.W.3d 607, 617 n. 6 (Mo.App.S.D.2011). We have therefore encouraged attorneys—as they have done here—to address the topics separately. *Id.* For the same reasons, it would be helpful if trial courts also addressed them separately in their judgments.

4. Each child has a different father, and each father currently has physical custody of his child. The Juvenile Office was granted leave to dismiss the termination petition as to the father of C.M.H. after evidence had been submitted as to Mother but before the judgment against Mother was entered. In requesting dismissal of the petition against the father of C.M.H., the Juvenile Office stated that he was regarded as "an appropriate placement for [C.M.H.,]" and the trial court "authorize[d] permissive placement." The trial court denied the petition that sought to terminate the parental rights of the natural father of S.F.H., and the legal file reflects that by January 2013, S.F.H. had been permissively placed in the physical custody of her father.

5. Because Mother's fourth point is dispositive of her appeals, her remaining points are moot and will not be addressed.

*terest of T.G.*, 965 S.W.2d 326, 332 (Mo. App.W.D.1998). Of utmost concern in parental rights cases is the best interests of the children. *In the Interest of J.K. and R.T.H.*, 38 S.W.3d 495, 499 (Mo.App.W.D.2001). Conflicting evidence will be reviewed in the light most favorable to the judgment of the trial court. *A.S.W.*, 137 S.W.3d at 452.

However, because parental rights are a fundamental liberty interest, statutes that provide for the termination of parental rights are strictly construed in favor of the parent and preservation of the natural parent-child relationship. *Id.* at 454. "The termination of parental rights is the exercise of an awesome power, and should not be done lightly." *In the Interest of P.D.*, 144 S.W.3d 907, 910 (Mo.App.E.D.2004). The decision to terminate such rights, therefore, will be reviewed closely.

*In re S.M.H.*, 160 S.W.3d 355, 362 (Mo. banc 2005). "The termination of parental rights has been characterized as tantamount to a 'civil death penalty.'" *In re K.A.W.*, 133 S.W.3d 1, 12 (Mo. banc 2004) (citations omitted).

 Termination of parental rights under chapter 211 requires a two-step process.

First, the trial court must find that one statutory ground for termination of parental rights exists. Section 211.447.6. The trial court's finding must be supported by "clear, cogent and convincing evidence that grounds exist for termination pursuant to subsection 2, 4 or 5 of [section 211.447]." *Id.* Evidence is clear, cogent and convincing, if it "instantly tilts the scales in favor of termination when weighed against the evidence in opposition and the finder of fact is left with the abiding conviction that the evidence is true."

*In re B.J.H.*, 356 S.W.3d 816, 823–24 (Mo. App.W.D.2012) (quoting *K.A.W.*, 133 S.W.3d at 12). "Where the [trial c]ourt finds multiple statutory grounds for termination of parental rights, in order to affirm the judgment, we need only find that one of the statutory bases was proven and that the termination was in the best interest of the child." *In re K.A.W.*, 220 S.W.3d 310, 315–16 (Mo.App.S.D.2007).

 If the first step is satisfied, the trial court must next consider "whether terminating parental rights is in the best interests of the child. Section 211.447.6." *B.J.H.*, 356 S.W.3d at 824. "In any termination of parental rights, the primary concern must be the best interests of the child." *In re A.B.M.*, 17 S.W.3d 912, 915 (Mo.App.S.D.2000). The trial court must find, by a preponderance of the evidence, that termination of a parent's rights is in the best interests of the child based on a subjective assessment of the totality of the circumstances. *In re T.L.B.*, 376 S.W.3d 1, 13 (Mo.App.S.D.2011). "[O]n appeal, the standard of review is abuse of discretion." *In re Adoption of C.M.B.R.*, 332 S.W.3d 793, 816 (Mo. banc 2011); *In re P.L.O.*, 131 S.W.3d 782, 789 (Mo. banc 2004). "Judicial discretion is abused when a court's ruling is clearly against the logic of the circumstances then before the court and so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *In re A.S.*, 38 S.W.3d 478, 486 (Mo.App.S.D.2001).

### Facts and Procedural Background

Viewed in the light most favorable to the judgments, the facts are as follows. C.M.H. was born in June 2007, and S.F.H. was born in January 2009.

An investigator for the Missouri Department of Social Services, Children's Division ("the Children's Division"), Lara Chism, contacted Mother on June 24, 2010,

after receiving a report that Mother had not filled prescriptions ordered for S.F.H. to treat ear and upper respiratory infections. Chism observed that Mother "had a black eye[,]" and Mother said that the father of S.F.H. was in jail as a result of domestic violence between them. Mother admitted that S.F.H.'s medicine had been prescribed on June 14th, but she claimed she had not filled the prescriptions "because there had been issues with the children's Medicaid." S.F.H. "was clean and moving around the house and didn't appear to be in any distress[,]" but because ten days had elapsed from the time she had been diagnosed—and Chism thought that S.F.H. had been without medication during that time—she recommended that Mother take S.F.H. back to the doctor. The appointment was made for the next day.

Chism spoke with Mother twice on June 30th. In the first conversation, she confirmed that Mother had taken S.F.H. to the doctor, but she also learned that Mother did not pick up prescriptions called into a Wal–Mart pharmacy on June 25th until four days later. Chism contacted Mother the second time after receiving a report that Mother "had given [S.F.H.] antibiotics that had been prescribed to [Mother's] mother." Mother admitted that she had done this prior to June 23rd when she did not pick up the prescribed medicine the first time.

Chism asked Mother to take a drug test (to be paid for by the Children's Division) by 5:00 p.m. on June 30th because the father of C.M.H. and another family member had expressed concern that Mother was using drugs. Mother did not take the test, and she did not return several calls from Chism before Chism was finally able to speak with her on July 2nd. Despite having previously assured Chism that "she had someone that could get her there[,]"

Mother said she did not have a ride to the testing center. By this time, Chism had spoken with Mother's probation officer, and Chism talked to Mother about entering an inpatient drug treatment program. Mother was unwilling to do so.

Mother then failed to take a drug test requested by Chism on July 6th. At a conference at the Juvenile office the next day, Mother said that she was not going to let the father of S.F.H. back into the house when he got out of jail "[b]ecause of the domestic violence and the drugs." She also admitted "that she used drugs with [the father of S.F.H.] when the children were in the home[.]" Mother admitted using methamphetamine "on and off for four years[,]" but she claimed that her last use of the drug was while the father of S.F.H. "was still living in the home" and that they were both "under the influence at the time of the domestic violence incident[.]" Mother submitted to a drug test at the Juvenile Office, and she said that it "would be positive for marijuana." Mother's drug test came back positive for both marijuana and methamphetamines, and "[t]he children were taken into protective custody by the Juvenile Officer."

Chism concluded that the family needed services based upon Mother's "failure to provide medication to [S.F.H.] on two separate occasions," "providing medication that was not prescribed[,]" drug use, and domestic violence. The Children's Division had also conducted assessments or made referrals related to one or both of the children on five other occasions between December 2007 and April 2010.

A family foster care case manager, Amanda Dunham, had responsibility for the children's cases from the time the children came under the trial court's jurisdiction. The goal for the cases was initially "[r]eunification with [M]other." The issues to be addressed and resolved were

Mother's "[s]ubstance abuse [and] some general parenting classes to address the medical issue that had brought [the children] into care." Dunham developed a treatment plan for Mother, admitted at trial as Juvenile Office's Exhibit 16, that Mother signed on August 6, 2010, and it remained in effect throughout the case.

One of Mother's three goals under the treatment plan was "to abstain from drug and alcohol use[,]" and Mother agreed to complete specified tasks in pursuit of this goal. Specifically, Mother was "to complete a drug and alcohol assessment and follow through with the recommendations." Mother completed the assessment, but her subsequent inpatient treatment was interrupted when "she was given permission to leave for [a] family emergency"—a relative's terminal illness. When Mother came back, "the inpatient beds were full, so she began outpatient treatment until an inpatient bed" opened up. During this time, however, Mother stopped participating "and/or" attending, and she was "discharged" from the program in March 2011. Mother was then referred to another drug assessment and treatment program, and she completed the inpatient and outpatient phases of that program. Mother's probation officer and "the team" [6] also asked Mother "to attend AA/NA meetings . . . in the community." From December 2011 until trial in August 2012, Mother attended six such meetings.

On October 31, 2011, a deputy juvenile officer ("the Juvenile Office") filed petitions seeking to terminate the parental rights of Mother and both fathers.[7] In regard to the allegations against Mother, each petition alleged "abuse and/or neglect" and failure to rectify as the statutory grounds for termination. A chemical dependency by Mother was an underlying factor supporting each assertion. The petitions also alleged that the best interests of the children would be served by terminating the parental rights of Mother and both fathers.

Approximately one week prior to trial, Mother's counsel made an oral request that the trial be continued on the grounds that there were "other alternatives" to termination in that the father of C.M.H. was "doing well enough" and "if he end[ed] up getting the children placed with him" then termination of Mother's parental rights would have the effect of "bastardizing" the children, thereby depriving them of any financial benefits that Mother might be able to provide. The trial court denied that request and proceeded to trial on August 21, 2012 in regard to the allegations against Mother and the father of S.F.H. A continuance of the trial was granted in regard to the father of C.M.H.

At trial, Dunham was concerned about some of Mother's drug-test results. Mother tested positive in April 2012 for marijuana, and she was a "no-show" for a test in May 2012, which was then "documented as a positive" test result. Mother told Dunham she had been charged with driving while intoxicated ("DWI") in April 2012, but she did not do so until after Dunham had already learned of it.

Another task in support of Mother's goal of abstaining from drug and alcohol use was "to participate in individual counseling and follow through with recommenda-

---

**6.** Based upon the testimony of Dunham, Robin Pummill, and Sueann Robinson, it could be reasonably inferred that the reference is to the Family Support Team ("FST"). See section 210.762. We will use "the FST" to reference "the team" and "Family Support Team."

**7.** Neither father is a party to these appeals. We therefore recite evidence concerning them only as necessary to address Mother's appeals.

tions." Mother was discharged by one counselor after poor attendance between August and November 2010. She stopped counseling with a second counselor in April 2012, and she made no request to be referred to another counselor.

Mother's second goal was to "develop a positive and professional relationship with the [FST] so that trust [could] be built between [Mother] and team members." One task in support of this goal was for Mother to "contact her case worker at least once (1) a week." Dunham said Mother "stop[ped] regular communication" after the DWI charge in April 2012. Mother made "sporadic phone calls" indicating that she was still in Springfield, but she said she was "just staying . . . with various friends[.]" The FST "asked [Mother] to . . . establish contact with the [FST] so that [they] could discuss what needed to happen to address the relapse." Mother did nothing in response to that request, and "[s]he did not come to any following meetings[.]"

Mother's third goal was to "prepare her residence and herself for [the children's] return." She completed parenting classes—one of the tasks assigned in relation to this goal—and she had several jobs up until sometime in April 2012. Mother "would often bring[ ] gifts and clothes, [and] snacks to the visits. If there was a birthday or a holiday, she would bring . . . items for those." Mother also paid child support, but her $21 payment in February 2012 was the last payment reported to Dunham.

Mother was initially consistent in her visitation with the children, and she progressed from supervised to unsupervised visits in September 2011. Dunham, who had supervised some of the visits, observed no problems. But shortly after unsupervised visits were approved, they were terminated when Mother brought someone with her "who was not approved to be at the visit." Unsupervised visits resumed in January 2012 and were expanded to include overnight visits. Mother had only two of these unsupervised, overnight visits with the children before they were stopped when Mother was charged with DWI. And while the children were not in the car at the time of the DWI incident—Mother had left them with a co-worker—they were nonetheless considered to be "in [Mother's] care."

Supervised visits with the children were available to Mother after her DWI incident, but Mother stopped contacting Dunham, and Mother's opportunity for supervised visits was "suspended" in May pending Mother's attendance at a FST meeting "to discuss the situation further." Mother did not attend a subsequent FST meeting. At the time of trial, Mother had not provided verification of counseling or therapy "since April or May," and Mother's substance abuse was the "major" and "primary concern" preventing the children from being reunited with her.

A psychologist, Dr. Mark Bradford, evaluated Mother in September 2010, and his report, Juvenile Office Exhibit 20, was admitted into evidence without objection. Dr. Bradford opined that Mother's "main issue was probably drugs" (and probably "poly-substance abuse") because she used marijuana "all the time[,]" methamphetamine as "a chronic thing," and "alcohol was a regular thing that she kept falling back to." His report included diagnoses for Mother of Cannabis Dependence, Methamphetamine Abuse, and Alcohol Dependence. Mother indicated to Dr. Bradford that "[s]he didn't perceive adequate family support, [she had a] history of very troubled relationships, [and] a history of chronic drug abuse then for more than 10 years . . . most of her adult life and . . . her entire teenage years were involved in

drug abuse." Dr. Bradford testified that in terms of a "timeframe of clean living," he would want to see someone "staying away from the drugs and alcohol" for "9 to 12 months," not including time spent in prison or jail. At the time of his report, Dr. Bradford's prognosis for Mother's ability "to parent children" "was very guarded[.]"

A licensed counselor, Robin Pummill, testified that she met with Mother for counseling beginning in November 2010. She ended her services in April 2012 after she was unable to reach Mother. Pummill met with Mother 44 times during that period, apart from "some no-shows[.]" She worked with Mother on behaviors associated with drug "relapse, a lot of codependency issues," depression, impulsiveness, toxic relationships, and the children being in custody. Pummill described Mother as having made "a little bit of progress, but it was—with her, just a continual process of just up and down, off and on[.]" During her counseling tenure, Mother was unable "to keep" an apartment. When Pummill last saw Mother in April 2012, "she was spiraling down again." Mother had a job at that time, but she was not as consistent in attending therapy sessions, she was "late for appointments[,]" and there was "such a struggle, a lot [of] procrastination" in getting Mother to attend "NA meetings or AA meetings[.]" "[P]roblems were starting to develop" with Mother's compliance with visitation guidelines, causing Pummill "great concerns over" Mother "pushing limits and boundaries[.]" Pummill testified that "not one thing was resolved" as a result of their therapy sessions, and she was concerned about Mother's ability to "provide appropriate care for [the children.]" In a May 2012 report prepared by

Pummill, received into evidence without objection as Juvenile Office's Exhibit 14, Pummill stated that she was "greatly concerned of [sic] [Mother's] emotional stability to parent [the children]."

A Missouri Probation and Parole officer, Sueane Robinson, said that she personally supervised Mother's probation for approximately 18 months beginning in December 2010. The underlying offense was "leaving the scene of an accident" that "was ... alcohol-related[.]" Mother absconded from supervision in May 2012 after last reporting in April 2012. The last time Mother's employer had heard from her was when she "handed in her keys and said she was headed to Texas." When Mother eventually contacted Robinson, Robinson informed her that she was considered an absconder, a warrant had not been issued for her arrest, and Mother should come in to "try to work everything out." Mother "chose not to do that." Mother was arrested in July 2012, and she was still in custody at the time of trial.

While under Robinson's supervision, Mother's attendance on monthly reporting dates "var[ied] based on how [Mother] was doing," and how Mother was doing depended on whether "she was engaged in substance abuse treatment[.]" Mother violated the terms of her probation 13 times—nine of which occurred under Robinson's watch. The violations "range[d] from not completing community service to being unsuccessfully discharged from [an inpatient drug treatment center], not attending support group meetings, being positive for alcohol on a couple [of] occasions, receiving [the April 2012] DWI [charge [8]] out of Dade County, not reporting as directed on several occasions, smoking marijuana, and employment [sic]." There was an outstanding warrant for

---

8. A report Robinson received from "a MULES hit" indicated that "K2" was also found in Mother's vehicle and that "she blew a .209 [presumably on a breathalyzer test]."

Mother in relation to her DWI charge for failing to appear for court as directed. Robinson said that Mother also reported being "in the hospital ... on a 96–hour hold" "right after the DWI[.]"

Robinson planned on recommending that Mother's probation be revoked and that she be sentenced so as to receive 120 days of "intensive treatment" in the Department of Corrections. Robinson "[a]bsolutely" felt like Mother had exhausted the services available to her in the community. Robinson had delayed recommending that Mother's probation be revoked because she "was giving [Mother] a chance to reunite with [the children], make things right ... however, in [Robinson's] discussions with her, [Mother] didn't know if she wanted her kids back."

A counselor for the children, Ashley Pritchett, testified that she began sessions with C.M.H. in May 2012, after the child's visits with Mother had stopped, and Pritchett also had a session with S.F.H. in July 2012. She testified that C.M.H. "was having some problems coping with being away from her family members and her mother. Some behavior problems, nothing severe, but just some problems with her being able to emotionally cope." According to Pritchett, C.M.H. was attached to Mother. C.M.H. was also "mad at being separated from [Mother]," and she was mad that Mother made choices resulting in their separation. Pritchett was working with C.M.H. "on coping skills for grief and anger[.]" Pritchett was concerned that S.F.H. possibly had similar issues, but to a lesser degree. She saw C.M.H. on a weekly basis, and she planned on seeing S.F.H. on a monthly basis.

Dunham also testified that Mother was attached to both of the children and that the children were bonded to her. At the time of trial, the children were "in a traditional foster home that [was] not a perma-nent placement option[,]" and a home-study referral had been made concerning the father of C.M.H., who was having un-supervised, extended visits with C.M.H. that appeared to be going well. Dunham recommended that Mother's parental rights to and over the children be termi-nated.

Dunham's "COURT SUMMARY[,] In-voluntary Termination of Parental Rights," admitted as Juvenile Office's Exhibit 18, was dated December 12, 2011, and an "Ad-dendum" to this report, admitted as Juve-nile Office's Exhibit 19, was dated July 23, 2012. The Addendum noted that Mother "remain[ed] married to [the father of C.M.H.] and has not yet filed for divorce. [The father of C.M.H.] has reportedly giv-en [Mother] money towards [sic] the di-vorce, however he reports that he found out the money was not put towards [sic] the divorce." Dunham understood that if Mother's parental rights were terminated, but C.M.H. was "eventually placed with [her father,]" then C.M.H. would be "bast-ardized ... legally" and that "Missouri has a policy not to do that."

At the conclusion of evidence, the trial court took "[M]other's case as heard and submitted." On November 9, 2012, it en-tered judgments terminating the parental rights of Mother to and over the children. These appeals timely followed. Additional evidence and specific factual findings made by the trial court will be set forth in the context of our analysis of Mother's fourth point.

## Analysis

*Point IV—The Trial Court's Best–Interests Finding*

■ As Mother acknowledges, the de-termination of a "child's best interest is a subjective assessment based on the totality of the circumstances." *In re C.A.M.*, 282

S.W.3d 398, 409 (Mo.App.S.D.2009). She also acknowledges that we review the trial court's decision for an abuse of discretion. Her straightforward claim is that the deprivations the children would suffer as a result of the termination judgments—without any offsetting benefits—reveal that the trial court's best-interests determination was "against the logic of the circumstances that were before the trial court, and thereby constitutes an abuse of discretion." After reviewing the record and the trial court's factual findings, we must agree.

Section 211.447.7 requires the trial court, "[w]hen considering whether to terminate the parent-child relationship pursuant to ... subdivision .:. (2) [or] (3) ... of subsection 5 of this section," to

> evaluate and make findings on the following factors, when appropriate and applicable to the case:
>
> (1) The emotional ties to the birth parent;
>
> (2) The extent to which the parent has maintained regular visitation or other contact with the child;
>
> (3) The extent of payment by the parent for the cost of care and maintenance of the child when financially able to do so including the time that the child is in the custody of the division or other child-placing agency;
>
> (4) Whether additional services would be likely to bring about lasting parental adjustment enabling a return of the child to the parent within an ascertainable period of time;
>
> (5) The parent's disinterest in or lack of commitment to the child;
>
> (6) The conviction of the parent of a felony offense that the court finds is of such a nature that the child will be deprived of a stable home for a period of years; provided, however, that incarceration in and of itself shall not be grounds for termination of parental rights;
>
> (7) Deliberate acts of the parent or acts of another of which the parent knew or should have known that subjects the child to a substantial risk of physical or mental harm.

"There is no requirement, statutory or otherwise, that all seven of these factors must be negated before termination can take place; likewise, there is no minimum number of negative factors necessary for termination." *C.A.M.*, 282 S.W.3d at 409. Indeed, these factors "are merely an aid to the 'best interests' determination." *In re G.G.B.*, 394 S.W.3d 457, 472 (Mo.App.E.D.2013).[9]

Here, the trial court found that "[e]vidence was presented that the child[ren] had ties and bonds with [Mother]"; that Mother "maintained contact with the child[ren]"; and Mother "did provide items of in-kind support for the child[ren]." The trial court found that there was "[n]o evidence" of a conviction "of such a nature that the child[ren] will be deprived of a stable home for a period of years" nor

---

**9.** We note that in *G.G.B.*, the judgment terminated the father's parental rights but "[i]t did not adjudicate the termination of mother's parental rights," "no judgment ha[d] been entered with respect to mother[,]" and the petition against mother "remained unadjudicated while this appeal was pending." *Id.* at 461 and 462. That is distinguishable from the instant case where the petition as to the father of C.M.H. was dismissed by the Juvenile Office and the trial court specifically found no grounds for termination as to the father of S.F.H. The case is further distinguishable because it does not appear that the father in *G.G.B.* raised the same point presented by Mother in her point IV. *Id.* at 472–73.

deliberate acts which Mother knew would have "subjected the child[ren] to a substantial risk of physical or mental harm[.]"

On the negative side, the trial court found that Mother "was inconsistent in financial support provided for the child[ren]"; Mother, "while participating in services[,] consistently failed to demonstrate sobriety or stability"; "[t]he continuation of the parent-child relationship greatly diminishes the child[ren's] prospects for early integration into a stable and permanent home"; and "[t]he inability of [Mother] to provide proper care, custody and control for [the children] is potentially harmful to the child[ren] should the child[ren] be returned to that environment." Based on these findings, the trial court concluded that the best interests of the children would be served by terminating Mother's parental rights.

In addition to citing the favorable findings of the trial court (concerning bonding, past financial support, and contact) that militated against termination, Mother also maintains that the termination deprives the children of their future right to receive financial support, affiliation, and a potential inheritance from Mother, citing *In re R.A.S.*, 826 S.W.2d 397, 401 (Mo.App.W.D. 1992) (where a requested voluntary termination of parental rights under section 211.444 was denied as not being in the best interest of the child). Mother argues that "[t]here was no evidence that Mother was facing a long-term incarceration," that "based on her employment history she would be employed again[,]" and that it cannot be in the children's best interests to cut off any such future financial support. Mother makes a similar argument regarding the children's right to receive an inheritance "from Mother, or from anyone on Mother's side of the family."

Further, while the record does not support Mother's claim that the children's fathers are unmarried,[10] her larger point— that there was no evidence that anyone was ready "to step into Mother's shoes and take her place as a parent to the [c]hildren"—remains valid. As noted by Mother, our statutory provisions governing termination look to a "replacement of the natural parent by another guardian or an adoptive parent." *In re M—*, 393 S.W.2d 109, 115–16 (Mo.App.1965) (construing a former version of Missouri's termination of parental rights statute, section 211.441, RSMo 1959). The core of Mother's argument is that it cannot be in the children's best interest to lose their mother "with no replacement waiting[.]"

The Juvenile Office's response does not directly address these arguments. It simply points to Mother's poor parenting performance, most notably her arrest for D.W.I. during a time when she had overnight visitation with the children, and to her subsequent failure to cooperate with the FST. It then states that the failure to terminate Mother's parental rights would "keep the child[ren] in legal limbo"[11] on the possibility that she "might provide support or that the [children] might some day

---

**10.** Mother contends in her brief that "there was no evidence that either [the father of C.M.H.] or [the father of S.F.H.] were married, or even had a significant other[.]" Juvenile Office Exhibit 19, the Addendum, reported that as of its July 2012 date, Mother was still married to the father of C.M.H. Dunham testified that to her knowledge, the father of S.F.H. was still married to another woman as of the date of trial, but "[h]e had reported he was going to file a divorce" and Dunham thought that the wife of the father of S.F.H. had filed for a divorce.

**11.** The Juvenile Office does not define what it means by "legal limbo," nor does it explain why a child legally residing with a natural parent (in these cases, with a father) would constitute confinement in such a place.

inherit[.]" The Juvenile Office states that it "could not find a case supporting [such a] proposition[,]" and its brief does not attempt to distinguish the Western District's reasoning in *R.A.S.*, 826 S.W.2d at 399–401 (noting the importance of the public policy that a minor child not be cut off from his right to receive monetary support from his natural parents).

In *R.A.S.*, the father of a minor child appealed the trial court's dismissal of his petition to voluntarily terminate his parental rights.[12] *Id.* at 398. The trial court found that the child's best interests would not be served by such a termination, even though the father had no contact with the child, did nothing toward developing a relationship with the child, and maintained that he would not support the child unless forced to do so. *Id.* at 398–99. The child, eight years old at the time, was found to have "emotional ties to [the f]ather as a result of his awareness of his parentage." *Id.* at 399. In the process of obtaining a divorce, it was established that the husband of the child's mother was not the child's father. *Id.* at 398. On appeal, the father argued that the termination of his parental rights was in the child's best interests because "his rejection of [the child] was beginning to adversely affect the child[.]" *Id.* at 399. The Western District rejected the argument as "a transparent attempt to avoid support." *Id.*

While the facts of *R.A.S.* are different— the father there wanted to terminate his parental rights while Mother would like to keep them—we still find its reasoning persuasive. "The termination of parental rights does not merely sever the rights of the parent to the child, but also severs the child's right to the parent." *Id.* at 401. As in *R.A.S.*, the record in the instant case

is devoid of any evidence that either of the children's fathers (whose parental rights were not terminated by these judgments) "have a spouse with a potential interest in adopting the child." *Id.*

▮ That is not to say that a parent must have a spouse, that a child must have the equivalent of two parents, or even that an adoptive parent must be identified at the time of all terminations. But when a child has two parents, the relative disadvantages and advantages of terminating only one such parent's rights is a part of the totality of the circumstances that a trial court should consider in determining whether termination is in the child's best interests; it should include a consideration of what the child loses if termination is ordered. *Cf. In re B.L.G.*, 731 S.W.2d 492, 499 (Mo.App.S.D.1987) (judgment reversed where relieving the father of his support obligation via a voluntary termination action was "not in the best interests of" the child).

In affirming the trial court's exercise of discretion to deny termination, the Western District concluded in *R.A.S.*:

> The termination of [the f]ather's parental rights would deprive [the child] of his future rights to support, affiliation and inheritance without any evidence of a present benefit to [the child] resulting from the termination. These circumstances were properly considered by the trial court in its decision that the termination did not serve [the child's] best interests.

826 S.W.2d at 401.

Section 211.477.2 provides that "if the conditions specified in section 211.447 are found to exist as to only one parent, the rights of only that parent with reference to

---

**12.** The original petition was amended to allege that the "[f]ather consented to the termination." *Id.* at 398. A voluntary termination still requires the court to find that termination is in the best interests of the child. *See* section 211.444.1; *see also id.* at 399.

the child *may* be terminated and the rights of the other parent shall not be affected" (emphasis added). This possibility does not obviate the requirement that doing so be supported by substantial evidence that it will serve the best interests of the child.

Indeed, and significantly, section 211.477.4 foresees situations where termination will *not* serve a child's best interests even if statutory grounds for termination are proved:

> 4. If, after the dispositional hearing, the court finds that one or more of the grounds set out in section 211.447 exists, but that termination is not in the best interests of the child because the court finds that the child would benefit from the continued parent-child relationship ... the court may:
>
> (1) Dismiss the petition and order that the child be returned to the custody of the parent;
>
> (2) Retain jurisdiction of the case and order that the child be placed in the legal custody of the parent, the division, a private child-caring or placing agency, a foster parent, relative or other suitable person who is able to provide long-term care for the child. Any order of the court under this subdivision shall designate the period of time it shall remain in effect, with mandatory review by the court no later than six months thereafter. The court shall also specify what residual rights and responsibilities remain with the parent. Any individual granted legal custody shall exercise the rights and responsibilities personally unless otherwise authorized by the court; or
>
> (3) Appoint a guardian under the provisions of chapter 475.

*Cf. In re W.L.B.*, 6 S.W.3d 408, 410 (Mo. App.W.D.1999) (a finding that a parent is "unwilling or unable or unfit to serve as a guardian" does "not conflict with the [trial] court's decision not to terminate [the parent's] right to parent her children"). Further, as earlier noted, statutes "provid[ing] for the termination of parental rights are strictly construed in favor of the parent and *preservation of the natural parent-child relationship*." *S.M.H.*, 160 S.W.3d at 362 (emphasis added).

Here, the concern expressed by the Juvenile Office in its brief about possible "legal limbo" is, of course, not evidence that was considered and relied on by the trial court in its findings. Even if it were, it would have been of limited import when weighed against the trial court's findings concerning the children's actual relationships with Mother. *Cf. C.B.L. v. K.E.L.*, 937 S.W.2d 734, 738 (Mo.App.E.D.1996) (concern that child could be "in limbo" if something happened to custodial father "is a valid consideration in a stepparent adoption but we do not find it outweighs the benefits to the child arising from his relationship with his natural mother").

"Every child is entitled to a permanent and stable home[,]" *In re Z.L.R.*, 347 S.W.3d 601, 608 (Mo.App.S.D.2011), but no evidence was adduced in the instant case that demonstrated how a termination of the children's legal connection to Mother would help the children reach that goal. The trial court could properly have considered whether any such evidence outweighed the loss of current family identity and the potential of future monetary support garnered either directly or indirectly from Mother.[13] Here, no evidence was

---

13. For example, *see* 42 U.S.C sect. 402(d)(1) (2004) *et seq.* concerning possible social security benefits for a "child ... of an individual entitled to old-age or disability insurance ben-

presented to show that the preservation of the legal link between the children and Mother would either expose the children to the possibility of physical harm or would be psychologically harmful to them. The trial court has the discretion to give great weight to evidence that a reviewing court might consider less significant, but it cannot engage in speculation; it cannot assign any weight to that which is not presented.

The consideration of benefits afforded purely by the existence of a parent-child relationship is not a factor listed in subsection 211.447.7, but, as earlier noted, the statutory factors are simply an aid to the trial court in making its best interests determination. *See G.G.B,* 394 S.W.3d at 472. It is true that not every child has the benefit of having two identifiable, legal parents. But for any child who does, the totality of the circumstances regarding the benefits lost as a result of cutting off one of those two avenues of support must be considered and weighed against any offsetting benefits achieved by the severing of that fundamental relationship.

■ It should also be noted that "[r]eversal of the juvenile court's order terminating [m]other's parental rights does not mean that physical custody of the children should forthwith be returned to her." *In re A.M.C,* 983 S.W.2d 635, 640 (Mo.App.S.D. 1999). The trial court retains jurisdiction over the children as long as the underlying cases remain open, and it can impose limitations on Mother's contact with the children that it believes are necessary to provide for their safety and well-being. *See X.D.G.,* 340 S.W.3d at 622–623 (reversal does not mean that parent's rights may not be terminated in the future or that the child "should be removed from the supervision of the trial court"); *In re K.W.,* 167 S.W.3d 206, 216 n. 8 (Mo.App.E.D.2005)

("Our disposition has no bearing on the Division's custody of the children or the trial court's jurisdiction over them, nor does it foreclose the possibility of future proceedings to terminate [the m]other's parental rights").

After our close review of the trial court's findings and the evidence adduced at trial, "we are left with the firm belief that the order was wrong." *In re T.G.,* 965 S.W.2d 326, 332 (Mo.App.W.D.1998). Under the circumstances present here, where: (1) the parental rights of the children's fathers were not terminated; (2) the children were bonded to Mother; (3) Mother had provided some monetary and in-kind support to the children in the past; and (4) the absence of any evidence that the continuation of the legal familial relationship between Mother and the children would be in some way detrimental to the children—the trial court's finding that the drastic remedy of terminating Mother's parental rights was in the best interests of the children was not supported by substantial evidence and was "clearly against the logic of the circumstances then before the court[.]" *A.S.,* 38 S.W.3d at 486.

Point IV is granted. Because its resolution in Mother's favor requires reversal, Mother's other points need not be addressed. The judgments are reversed, and the cases are remanded for further proceedings consistent with section 211.477 and this opinion.

JEFFREY W. BATES, P.J., GARY W. LYNCH, J., concur.

efits, or of an individual who dies a fully or

currently insured individual[.]"